STATE, Respondent v. BRECH, Appellant

(169 N.W.2d 242)

(File No. 10562. Opinion filed July 1, 1969)

---

3. Oviatt v. Oviatt Dairy, Inc., 80 S.D. 83, 119 N.W.2d 649; Breitwieser v. State, **N.D.**, 62 N.W.2d 900; 99 C.J.S. Workmen's Compensation § 5.

**Richard R. Murphy,** Bruce, for defendant and appellant.

**Frank L. Farrar,** Atty. Gen., **Walter W. Andre,** Asst. Atty. Gen., Pierre, for plaintiff and respondent.

HANSON, Judge.

Defendant appeals from an order denying relief under the Uniform Post-Conviction Act (Chapter 121, Laws of 1966). He is now confined in the State Penitentiary serving a 40 year sentence imposed by the Honorable Walter H. Seacat on the 17th day of April 1964 following a plea of guilty to the crime of Manslaughter in the First Degree. The post-conviction relief sought is to have the sentence vacated or, in the alternative, to allow defendant to withdraw his plea to manslaughter in the first degree and allow a plea of guilty to the crime of manslaughter in the second degree. Defendant asserts his fundamental rights were violated as follows:

I. He was unable to aid in his defense and there was a doubt as to his competency within the range of the rule enunciated in Magenton v. State, 76 S.D. 512, 81 N.W.2d 894;

II. He did not enter a plea of guilty to the crime of manslaughter in the first degree and the court did not elicit one;

III. He received inadequate legal counsel and defense;

IV. The sentencing trial judge abused his discretion in sentencing defendant; and

V. The sentencing trial judge failed to advise defendant of his rights.

For obvious reasons the Honorable Walter H. Seacat disqualified himself in the post-conviction proceedings and the Honorable James R. Bandy was appointed to act in his stead. Judge Bandy proceeded to conduct an extended evidentiary hearing at which defendant attended and testified. The record and transcripts of such hearing contain 388 pages. At the conclusion of the hearing Judge Bandy prepared and filed a 17 page memorandum opinion and entered detailed findings of fact and conclusions of law upon which the order denying relief is based.

The record shows that during the evening of November 7, 1963 defendant shot and killed his 19-year-old daughter Betty, with a 30-30 rifle in the family home in Mitchell. The tragedy took place in the presence of defendant's wife and another daughter. He was arrested and charged with the crime of murder. After arrest defendant retained H. T. Fuller, one of the senior members of the law firm of Morgan & Fuller of Mitchell to represent him. Mr. Fuller is a past president of the South Dakota Bar Association and a most able, competent and experienced trial lawyer.

On December 3, 1963 defendant appeared in person and by his counsel, H. T. Fuller, for arraignment on the charge of murder. The arraignment was conducted by the Honorable Fred J. Nichol, one of the judges of the Fourth Judicial Circuit, who is now a Chief Judge of the United States District Court. Pleas of "not guilty" and "not guilty by reason of insanity" were entered. Following such pleas defendant was ordered to be examined by psychiatrists of his own choosing and he was further ordered to be transported to the State Hospital for the Mentally Ill at Yankton for examination by Dr. Lawrence G. Behan, Superintendent of the Hospital and by Dr. Baker, a member of its staff, relative to "his sanity or insanity, both with reference to the date of the alleged offense, the 7th day of November, 1963, and the current date with respect to his capability to stand trial upon said offense." He was thereafter examined by two psychiatrists of his own choosing and by members of the staff at the State Hospital.

The record further shows that on April 17, 1964 defendant appeared in person and by his counsel, H. T. Fuller, before the Honorable Walter H. Seacat at which time defendant withdrew his previous pleas of "not guilty" and "not guilty by reason of insanity" to the crime of murder and entered a plea of "guilty" to the included lesser offense of manslaughter in the first degree. He was thereupon sentenced to serve 40 years in the State Penitentiary. All of defendant's alleged violations of constitutional rights relate to this proceeding.

We find no violation of defendant's fundamental rights. This is convincingly, accurately, and fully reflected in the following portion of the Honorable James R. Bandy's memorandum opinion which we approve and adopt:

"The Commissioners on Uniform Laws consider the Post-Conviction statute to be in the nature of a civil proceeding and it is indicated in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 [9 L.Ed.2d 770], that the burden is upon the petitioner to establish his claims. The language used in Townsend, of course, refers to habeas corpus but since the purpose of the proceeding and the rights to be ascertained are the same, it would seem entirely applicable. It was therein written:

'State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution.'

In Magenton v. State (supra) our Court construed and applied SDC 34.2002, saying:

'Under this code section it is not necessary that the accused be actually insane to be entitled to a hearing on the issue of his present sanity. He must be accorded that protection if the facts are sufficient to raise only a doubt as to his sanity. The doubt referred to is one that must arise in the mind of the trial judge, rather than in the mind of some other person. * * * It must be a real doubt arising from facts and circumstances of a substantial character. * *

'In applying this statute the test of the accused's sanity is not the right and wrong rule above referred to. That concerns sanity in the sense of criminal responsibility for an act. We are here concerned with sanity for the purpose of present triability. Sanity in this regard is determined by appraising the present ability of the accused to so understand the nature and purpose of the

proceedings taken against him as to be able to conduct his own defense in a rational manner. * * * The statute does not say how this matter is to be brought to the attention of the court, but that omission is unimportant. It may be done on formal application or where no application is made, it may be done by the court on its own motion. And if the trial judge has any real doubt as to the sanity of the accused it is his duty to order the inquiry, even though not requested. * * However, because the court knows, or has reason to believe, that the accused is claiming that he was insane at the time the offense was committed does not of itself make necessary an inquiry into his present sanity. * * *

'Whether a trial court on its own initiative should order such inquiry is a matter addressed to its sound judicial discretion, and its decision will not be disturbed in the absence of an abuse of that discretion. * * * The accused has the burden in this regard, * * * and a strong showing is required to establish an abuse thereof. * * * Ordinarily sanity is presumed and where it is urged that the trial court had, or should have had, a doubt as to the present sanity of the accused, the court's failure to order the inquiry on its own motion is aided by that presumption.'

In Magenton the Supreme Court of South Dakota assumed, '* * * the trial court had examined the conclusions of the expert witnesses above set out and the psychologist's report.' It also wrote: 'We have carefully studied these documents.' All of the foregoing related to the product of the examinations had pursuant to the provisions of SDC 36.0109.

Unlike the situation in Magenton, Judge Nichol had expressly ordered the experts '* * * to examine the said defendant relative to his sanity or insanity, both with reference to the date of the alleged offense, the 7th day of November, 1963, and the current date with respect to his capability to stand trial upon

said offense;' These reports were before the sentencing Trial Judge on April 17, 1964, and I can think of no better authority for the consideration of such reports by the sentencing trial judge than our own Supreme Court. These reports clearly show the capacity of Doyle Brech, Sr. to stand trial at the date of their making. Nothing to show subsequent deterioration appears.

Additionally, the defendant had, in open court (albeit through his counsel, but in the defendant's presence) withdrawn his prior plea of not guilty by reason of insanity.

Paraphrasing the language used in Magenton:

'At all stages [of] the trial the accused was represented by counsel. Not until the institution of this proceeding on (January 4, 1967) was it suggested to any court that there was a doubt as to the sanity of the accused at the time of trial.'

This Court recognizes that the precise question considered in Magenton was as to whether the sentencing Trial Judge erred in not holding a sanity hearing in accordance with SDC 34.2002. The petition herein does not attack in that manner. It asserts and claims.

'That at all times from November 7, 1963, through the date of sentencing, on or about the 17th day of April, 1964, Petitioner, was and remained unable to cooperate or aid in his own defense, and, further, that on the date of the sentencing, he was unable to do anything, was unable to comprehend, unable to answer, understand, communicate; * * *'

The testimony of August Brech shows that, at least a month prior to the actual sentencing the Petitioner was advised that the Trial Judge thought 40 years would be a fair sentence on a plea of guilty to the lesser charge of Manslaughter in the First Degree and that the Petitioner 'didn't think it was right'. Again, the testimony of August Brech supplemented by the

testimony of Leona Bartling to establish the presence of the Petitioner, shows that Doyle Brech, Sr. knew on April 17th, 1964 that he was expected to enter a plea of Guilty to a charge of Manslaughter in the First Degree and that the sentencing Judge had indicated an intention to impose a sentence of forty years. The testimony of Doyle Brech Sr. shows that at and immediately prior to the sentencing he was fully aware of the procedure to be followed, inquired as to whether the sentencing Judge would accept a plea by the use of the word 'Yes' rather than 'Guilty', inquired as to the content of the medical reports, asked his counsel 'several questions about the law'. This Court must find that instead of establishing that the defendant was insane within the Magenton rule at the time of the sentencing, it fairly establishes that he fully comprehended what was taking place.

The only real contention of the Petitioner in this regard is that he was unable to recall the circumstances of his daughter's death. We cannot know whether this was real or feigned. In any event, a parital loss of memory, limited to a period of a few hours, could not be classified as insanity. As to such circumstances, the record establishes that at the time of what the Petitioner chooses to call 'the incident' or 'the tragedy', the members of his family were present. Yet, not one of them was called when testimony in mitigation was offered. One finds it difficult to believe that, if there had been any evidence whatever of extenuating circumstances such evidence would not have been forthcoming.

As to the contention that the defendant never entered a plea of Guilty to a Charge of Manslaughter in the First Degree, the record of the testimony of the Petitioner himself and of his counsel abundantly establishes that, because he could not recall having committed the act and because of his remorse, the defendant could not bring himself to use the term 'Guilty' but suggested that he would say 'Yes'. On the present hearing counsel for the petitioner sought to establish that the defendant was in such a mental state that he was unable to articulate the word 'Guilty'. This Court does not accept that interpretation by counsel.

The record fully establishes that the defendant, at the time of his second arraignment and sentencing fully knew precisely what was going to transpire. An experienced trial judge and his experienced reporter (who is not shown to have had any warning or information as to the intention of the defendant to say 'Yes' instead of 'Guilty') heard 'Yes'. While the trial judge did not require an additional yes answer from the defendant, the record shows that there was a pause, the Trial Judge having given an opportunity for correction in the event of any misunderstanding. In this connection, it is enlightening that at no time has the defendant contended that he answered 'No'. The fact of the business is that, in his own words, 'Well I was trying to answer, but my throat plugged up—'.

We are left to conjecture as to whether the witness was here claiming that the 'sound of my mind' was the word 'Yes' or whether he was admitting having made an 'utterance'. In the same breath he denied that his 'utterance' was 'voluntary' and, accordingly, it seems rather reasonable to assume that he heard 'Yes' as the 'sound of my mind'.

If any further explanation of this situation is required, it is to be found in later portions of the transcript of the arraignment, wherein his retained counsel said

'\* \* \* the difficulty he had in answering yes to your question was because of the fact that, as he told me hundreds and hundreds of times, "How can I plead guilty to something that I don't know that I did of that magnitude." He realizes now, and he did shortly thereafter, that he did kill his daughter: But he doesn't remember how he did it. \* \* \*'

The last page of the record of the sentencing contains the following:

'\* \* \* Now Mr. Brech, the court is going to accept your plea of guilty to manslaughter in the murder of your daughter; and this being the time and place fixed

by the court for the pronouncement of the judgment of the court upon your plea of guilty, I'll ask you again, do you have any legal excuse to offer why it should not be pronounced? You have none, have you?'

'MR. FULLER: Do you have anything more you'd like to say before the judge sentences you?'

'THE DEFENDANT: No.'

██ ██ There is not one word in the testimony now presented by the Petitioner which even seeks to negate this clear showing that the sentencing Judge had accepted a plea of Guilty and was about to sentence him. To his credit it must be said that the Petitioner does not now claim that he thought the Judge was about to sentence him for Manslaughter in the Second Degree. This, of course, would be inconsistent with his pretension that he did not know what was transpiring at the time of his arraignment and plea. While the record does show that he was, quite understandably, shaken at the time he entered his plea of 'Yes', it is undisputed that thereafter he became composed and listened intently to the testimony adduced in his behalf.[1]

---

1. Supplemental to the question of whether or not defendant entered a plea of guilty the record shows the following:

"The Court: * * * Now, Mr. Brech, included within the crime of murder is a lesser crime known as manslaughter in the first degree. I'll ask you now, are you guilty or not guilty of manslaughter in the first degree? You have to answer that.

Defendant: Yes.

The Court: You're guilty of manslaughter in the first degree—enter his plea of guilty to manslaughter in the first degree."

SDC 34.3520. "There are three pleas to an indictment or information. A plea of:
(1) Guilty;
(2) Not Guilty;
(3) A former judgment * * *.

Every plea must be oral and must be entered upon the minutes of the Court. The plea must be entered in substantially the following form:

(1) If the defendant plead guilty: the defendant pleads that he is guilty of the offense charged * * *."

SDC 34.3522. "* * * a plea of guilty must be put in by the defendant himself, in open Court."

In construing similar statutory requirements the California Court in People v. Manriquez, 188 Cal. 602, 206 P. 63, 20 A.L.R. 1441, concluded "that a plea of a defendant confessing himself guilty of crime should not be entered except with the express consent of the defendant, given by him personally in direct terms in open court, and his confession of guilt should be explicitly made * * * [but] the form of the plea is not of vital importance, provided the admission of guilt is clear, definite, and unconditional".

Likewise, in Herold v. Haugh, 259 Iowa 667, 145 N.W.2d 657,' it appears the trial court, on arraignment asked accused if he desired to change his plea and his attorney

The record on this hearing would have been improved had the State seen fit to elicit the testimony of other officials who were present at the time of this arraignment. However, the burden is not upon the State and the petitioner has not sustained his burden, either on probability or veracity considerations.

The record establishes that Doyle Brech Sr., did in fact, shoot and kill his daughter. He was so charged, he does not deny it, and, in fact, he offers to enter a plea of guilty to a charge of Manslaughter in the Second Degree at this time.

Clearly, therefore, he concedes having committed a homicide. By SDC 13.2001

'Homicide; defined; classified. Homicide is the killing of one human being by another. It is either:

(1) Murder;

(2) Manslaughter;

(3) Excusable homicide; or,

(4) Justifiable homicide.'

---

replied he wished to enter a plea of guilty. The trial judge then asked the accused two or three times if that was in fact the plea he wished to make and the accused "replied in the affirmative". Although Section 777.12 of the Iowa Code, 1962, requires that "The plea of guilty can only be made in open court and by the defendant himself * * *", the Iowa Court held that "a plea of guilty in open court by defendant's counsel, in the presence of defendant who knew and understood what was being done and acquiesced in the plea, is not a violation of due process which entitles defendant to relief in a collateral proceeding such as habeas corpus". The court further quoted with approval the following statement from Mayes v. United States, 8 Cir., Ark., 177 F.2d 505: "* * * it can no longer be said that mere failure to comply with precise ceremonial or verbal formality in respect to arraignment and entry of a plea is a denial of due process [of law] for which conviction must be set aside".

Also in Parrott v. Haugh, Iowa, 158 N.W.2d 766, the court found "no merit in petitioner's assertion his plea failed to comply with section 777.12. He acknowledged in open court while assisted by counsel that he knowingly and intelligently signed the written plea. He at no time voiced disapproval or dissatisfaction with the plea. He waived time for pronouncement of sentence which was then imposed. Such an acknowledgment in open court in the presence of his attorney is tantamount to an open court plea as required by section 777.12. Minor deviations from statutory procedure do not amount to a denial of due process entitling petitioner to relief in a collateral proceeding such as habeas corpus."

We agree with the conclusion reached by Judge Bandy that defendant's personal affirmation of guilt in direct response to the court's query substantially complies with the mandatory requirement that "a plea of guilty must be put in by the defendant himself in open court".

In State v. Painter, 70 S.D. 277, 17 N.W.2d 12, our Court said that this statute means precisely what it says. There is not the slightest contention that the homicide was either excusable or justifiable. Accordingly, it must have been murder or one of the degrees of manslaughter. A homicide may be Manslaughter in the Second Degree only if it is not murder or Manslaughter in the First Degree. It is abundantly clear that SDC 13.2013(2) makes homicide Manslaughter in the First Degree when a dangerous weapon is the means. A rifle is a dangerous weapon.

It is correct that the record shows that on at least two occasions the Petitioner said that a forty year sentence 'was not right'. This is a far cry from the contention that he said a plea of guilty was not right or at any time contended that he did not kill his daughter with a rifle. He claimed that he did not recall the act. There is not one scintilla of evidence to indicate that, at any time, did he have any doubts but that he had killed his daughter. Where he got the information is not of any particular importance. It is not questioned but that it is true. This Court can only read the Petitioner's protestations as meaning that he considered, and still considers, forty years imprisonment as too high a price for taking his daughter's life. Opinions would vary as to this.

Present counsel for the petitioner assumes that unlimited character witnesses were available. The testimony before this Court indicates that the witnesses who did testify were named in a list supplied by the Petitioner himself. Experience indicates that obtaining effective character testimony is extremely difficult in most cases and approaches the impossible in defense of crimes of violence.

Counsel argues that Mr. Fuller was derelict in not visiting the scene of the homicide. He fails to point out any possible benefit that might have obtained from his so doing. Had there been any evidence that the daughter's death was accidental, this would have been obtained from the family members who were eyewitnesses, not from the scene.

In essence, the situation is reasonably clear. Doyle Brech Sr. shot and killed his daughter in the presence of a number of the members of his family. He was apprehended and charged with Murder. He, through the good offices of his brother, employed H. T. Fuller, an outstanding member of the Davison County Bar. Mr. Brech claimed that he could not recall shooting his daughter. Mr. Fuller interviewed the eyewitnesses and learned nothing which would constitute a defense in the circumstances. A plea of Not Guilty and a Plea of Not Guilty by Reason of Insanity was interposed. Psychiatric examinations were had which produced nothing of value for defensive purposes. Doyle Brech Sr. was about to be put on trial for his life. Mr. Fuller was able to prevail upon the Trial Judge to accept a plea of guilty to the lesser included offense of Manslaughter in the First Degree and to indicate that he would not impose a sentence of greater than forty years. It could have been life imprisonment.

In State ex rel. Parker v. Jameson, 75 S.D. 196, 61 N.W.2d 832 our Court wrote:

'For an accused to question the capabilities of his lawyer following conviction, when the accused had the opportunity of obtaining counsel, is quite a different matter.'

From many opinions of like tenor the following may be quoted:

'When a criminal defendant asserts that his constitutional right to adequate representation by competent counsel has been violated, the burden of sustaining the allegation rests upon him.' People v. Crooker, 47 Cal.2d 348, 303 Pac2d 753.

'The handling of the defense by counsel of the accused's own choice will not be declared inadequate except in those rare cases where his counsel displays such a lack of diligence and competence as to reduce the trial to a farce or sham.' People v. Wein, 50 Cal.2d 383, 326 Pac2d 457.

██ Contrary to the foregoing, this Court would be willing to find that the defendant was most skillfully defended by his counsel.

██ The sentence of forty years was clearly within the discretionary power of the sentencing Judge. By SDC 13.2015 it is provided:

'Every person guilty of manslaughter in the first degree is punishable by imprisonment in the State Penitentiary for not less than four years.'

By SDC 13.0609 it is provided:

'Whenever any person is declared punishable for a crime by imprisonment in the State Penitentiary for a term of not less than any specified number of years, and no limit to the duration of such imprisonment is declared, the court authorized to pronounce judgment upon such conviction may, in its discretion, sentence such offender to imprisonment during his natural life or for any number of years not less than such as are prescribed.'

It is claimed that the sentencing Judge abused his discretion by the imposition of such sentence in that he considered matters not included within the plea which he had received. The principal foundation for this claim is a letter which Judge Seacat wrote, under date of April 23, 1964, and addressed to the State Board of Pardons, the Warden of the South Dakota Penitentiary, and the South Dakota Department of Pardon and Parole. This was six days after sentence had been imposed upon the petitioner, Doyle Brech Sr.

In Williams v. People of the State of New York (U.S.1949) 337 U.S. [241] 961, 93 L.Ed. 1337, 69 S.Ct. 1079, the Supreme Court wrote:

'To deprive sentencing judges of this kind of information would undermine modern penological procedural

policies that have been cautiously adopted through-
out the nation after careful consideration and experi-
mentation. We must recognize that most of the infor-
mation now relied upon by judges to guide them in
the intelligent imposition of sentences would be un-
available if information were restricted to that given
in open court by witnesses subject to cross-examination.
And the modern probation report drawn on informa-
tion concerning every aspect of defendant's life. The
type and extent of this information make totally im-
practical if not impossible open court testimony with
cross-examination. Such a procedure could endlessly
delay criminal administration in a retrial of collateral
issues.

'The considerations we have set out admonish us against
treating the due process clause as a uniform command
that courts throughout the Nation abandon their age-
old practice of seeking information from out-of-court sour-
ces to guide their judgment toward a more enlightened
and just sentence. Under New York statutes a state judge
cannot escape his grave responsibility of fixing sentence.
In determining whether a defendant shall receive a one-
year minimum or a twenty-year maximum sentence, we
do not think the Federal Constitution restricts the view of
the sentencing judge to the information received in open
court. The due-process clause should not be treated as
a device for freezing the evidential procedure of sen-
tencing in the mold of trial procedure. So to treat the
due-process clause would hinder if not preclude all courts
—state and federal—from making progressive efforts to
improve the administration of criminal justice.

'It is urged, however, that we should draw a constitu-
tional distinction as to the procedure for obtaining in-
formation where the death sentence is imposed. We
cannot accept the contention. Leaving a sentencing
judge free to avail himself of out-of-court information in
making such a fateful choice of sentence does secure

to him a broad discretionary power, one susceptible of abuse. But in considering whether a rigid constitutional barrier should be created, it must be remembered that there is a possibility of abuse wherever a judge must choose between life imprisonment and death. And it is conceded that no federal constitutional objection would have been possible if the judge here had sentenced applicant to death because appellant's trial manner impressed the judge that appellant was a bad risk for society, or if the judge had sentenced him to death giving no reason at all. We cannot say that the due-process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence.'

This letter, Exhibit '2', is not the 'Official Statement' required by SDC 34.3711. It is provided for and authorized by the provisions of SDC 13.5304, as amended:

'In preparing the case history the Director may enlist the services of any * * Circuit Judge in any wise connected with said case, and such other officers who may have knowledge concerning the inmate, or the circumstances surrounding the commission of the crime for which he was sentenced, or the previous history of the inmate.'

This Court knows that the Director as well at the Board of Pardons and Paroles have repeatly requested all of the trial judges to report upon inmates in the greatest possible detail and therefore would not require proof that specific inquiry was made in this case. In fact, it probably was not.

While not cited or referred to by counsel for the Petitioner, it was provided by SDC 34.3704 (subsequently amended), anent sentencing:

'No affidavit or testimony or representation of any kind, verbal or written, can be offered to or received by the

Court in aggravation or mitigation of the punishment, except as provided in this section.'

Whether SDC 34.3704 prohibits the procedures approved in Williams is unnecessary to decide in this case. Judge Seacat testified that some of the information assembled by the prosecution in preparation for the trial may have come into his hands prior to sentencing but that, to preserve complete impartiality, he had deliberately avoided reading it.

As to the conflict between the testimony of the sentencing Trial Judge and present counsel for the Petitioner, it can be explained as in praesenti justification of the sentence which had been imposed, in the light of the information which came to the Trial Judge subsequent to the imposition of sentence. While this Court is not so naive as to believe that the Trial Judge had not heard 'courthouse gossip' at the time of sentencing, he did, under oath, testify that he sentenced upon the basis of the offense charged. If this Court is compelled to determine veracity, it will find that the testimony of Judge Seacat is to be accepted.

■ ■ While this Court feels that Exhibit '2' is privileged as to the general public, it did not believe that it should be so treated as to the inmate as to whom it was written. Exhibit '2' was therefore received in evidence to ascertain whether it discloses in any manner that the sentencing Judge had considered the matters contained in the imposition of sentence. This Court has found nothing in it which in any manner indicates that the matters therein recited were in the mind of the sentencing Judge on April 17, 1964. Exhibit '2' in no manner contradicts the testimony of Judge Seacat. This Court will find that Judge Seacat had not examined and did not consider the data in the hands of the prosecution prior to imposing sentence.

The printed form used in reducing the Judgment and Sentence to writing contains the language '* * * and before a plea was entered the said Judge fully advised said Defendant of his rights in the premises, * * *'. The transcript establishes that Judge Seacat said nothing at all as to Constitutional rights at this arraignment. It is clear that the language

of the printed form is erroneous in reciting that he did. It is equally well established that upon the arraignment before Judge Nichol the Judge advised the defendant of the nature of the charge against him and asked his counsel: '* * * I assume Mr. Fuller you have advised Mr. Brech of all his constitutional rights?' and that Mr. Fuller answered: 'I have, Your Honor.'

Mr. Fuller's testimony on this hearing is explicit as to his fully advising the defendant as to his Constitutional rights prior to the arraignment which resulted in the sentence of forty years.

SDC 34.3506 requires that an unrepresented defendant be advised as to his right to counsel. Diligent search has not brought to light any requirement that a represented defendant be advised as to any Constitutional rights whatever by the Court, although, perhaps in an excess of caution, it is often done. SDC 34.2302 is deemed procedural.

It is to be noted that the statute, SDC 34.2302 requires that the judge: '* * * fully advise such person of his rights in the premises * * *'. This statute does not contain a requirement that the judge must also advise as 'to the consequences of such plea' as is required by the statutes of some states.

 It is made clear by the language of State v. Sewell, 69 S.D. 494, 12 N.W.2d 198, that an unrepresented defendant is entitled to such an explanation in South Dakota:

> 'When one accused of a capital offense comes before the bar of a court, **unaided by counsel,** to tender a plea of guilty, nothing less than the utmost of caution will satisfy the requirements of justice. In such circumstances the law does not contemplate a ceremony empty of substance. Until the court is solemnly persuaded by a painstaking explanation of the rights afforded the accused by the law, and of the extreme consequences his plea may entail, that the accused is acting with volition and understanding, a plea of guilty should not be entered.' (Emphasis supplied)

Many years ago it was written in State v. Reddington, 7 S.D. 368, 64 N.W. 170:

'Neither civil or criminal cases are tried for the primary purpose of vindicating or exemplifying formulated rules of law or practice. The object of every trial is to get at the very right of the matter in controversy.'

While the Information charged the defendant with a capital offense and the term at which trial would be had thereon was impending, it is crystal clear that everyone present knew that the defendant was not going to, and he did not, tender a plea of guilty to the charge of murder. Everyone knew that he was going to tender a plea of guilty to the included, non-capital, charge of Manslaughter in the First Degree. He knew that when he did so the Trial Judge would impose a sentence of not more than forty years, which was done. He was represented by counsel. Any attempt by the Trial Judge at advising 'such person as to his rights in the premises' would, indeed, have been a 'ceremony empty of substance', particularly as to a defendant aided by counsel. This bears no relationship to what transpired in State v. Sewell (supra).

In the mind of this Court much of the present difficulty in administration of the criminal law arises from an attempt to apply decisional statements found in extreme cases to matters bearing little resemblance. Recurrence to fundamental principles may at times be helpful. Sec. 27 Art. VI, S. D. Constitution.

It was written in Territory v. Miller, 4 Dak. 173, 29 N.W. 7 'We are quite mindful of all that has been said and written by humane and enlightened jurists concerning the sacredness with which the law regards the rights and privileges of those charged with crime, especially when such charge involves the life of the accused. We are not ignorant that very many criminals have escaped punishment upon grounds which to the nonprofessional mind have seemed mere technicalities; nor do we desire to question the wisdom of the rule which declares

that society must ascertain and punish offenders against its laws only under and through those regular forms which constitute what is known as "due process of law." But even these considerations, just and salutary though they are, must have a limit, and it becomes those who are charged with the duty of interpreting the laws to be careful lest, in their anxiety to afford even the most abandoned criminal the due protection of the law, they do not overstep the bounds and deprive society of that protection to which it is also justly entitled, and its right to which is surely just as sacred as that of any individual member.'

It is most striking that at no time has the Petitioner pointed out or claimed that there was a failure to advise him of any right he had. His present contention is predicated upon this error in the record as to the precise means by which he learned of these rights. There is not one word in the record to show that any right was denied or invaded.

The applicable portion of Chapter 121 Laws of 1966, being our Post-Conviction statute provides:

'Any person convicted of a crime and under sentence of death or imprisonment who claims that the conviction was obtained, or that the sentence was imposed, in violation of the Constitution of the United States or the Constitution or laws of this State, * * *'

■ This Court finds nothing in this record or in the law indicating that there was any necessity for the sentencing Judge to advise the defendant of any rights, that he had any rights as to which he was not advised, or that any right, whether contained in the Federal or State Constitution or laws was denied or invaded.

It follows from the foregoing that the relief asked by the Petitioner will be denied."

Affirmed.

RENTTO and HOMEYER, JJ., concur.

BIEGELMEIER, President Judge (concurs specially).

ROBERTS, J., dissents.

BIEGELMEIER, Presiding Judge (concurring specially).

Because I interpret the opinion to determine the evidence supports the findings on the issues raised by appellant, I concur in the opinion affirming the trial court's order. Bogue v. Clay County, 75 S.D. 140, 60 N.W.2d 218.

ROBERTS, Judge (dissenting).

This is a proceeding under the Post-Conviction Act, Chap. 121, Laws 1966. After an evidentiary hearing the trial court made specific findings of fact and stated its conclusions of law and the proceeding is before this court on appeal from an order denying relief. Section 6 of the Act provides that such order is a final judgment for purposes of review. The sole question presented on appeal is whether the record sustains the court's findings and conclusions of law that there were no infringements of appellant's constitutional rights.

A defendant has the fundamental right to stand trial and to require the state to prove the charges against him in accordance with procedural due process. A plea of guilty is something more than a confession. It is itself a conviction and like a jury verdict is conclusive. Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009. "A defendant who enters such a plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. **For this waiver to be valid under the Due Process Clause, it must be 'an intentional relinquishment or abandonment of a known right or privilege.'** * * * **Consequently, if a defendant's guilty plea is not equally voluntary or knowing, it has been obtained in violation of due process and is therefore void.**" McCarthy v. United States (April 2, 1969), 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418.

In State v. Sewell, 69 S.D. 494, 12 N.W.2d 198, the defendant appealed from a judgment imposing the death sentence upon his plea of guilty of the crime of murder. While the case did not present any issue of violation of constitutional rights, this court construing the provisions of SDC 34.2302, making it the duty of the judge before entry of plea of guilty to advise defendant of "his rights in the premises", recognized that the court has a duty to the accused offering a plea of guilty without any indication that accused knows or appreciates the possible consequences of such plea to admonish him with respect thereto. This court said: "Until the court is solemnly persuaded by a painstaking explanation of the rights afforded the accused by the law, and of the extreme consequences his plea may entail, that the accused is acting **with volition and understanding,** a plea of guilty should not be entered."

In Boykin v. State of Alabama (June 2, 1969), 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274, as in the instant case, the record did not show that inquiries were made by the court to determine that the plea of guilty was made voluntarily and knowingly. It was error, said the court, "plain on the face of the record, for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." Concerning the waiver of the constitutional rights of compulsory incrimination, the right to trial by jury and the right to confront one's accusers that takes place when a plea of guilty is entered in a state criminal trial, it was held that no waiver of such federal constitutional rights would be presumed "from a silent record".

Rule 11 of the Federal Rules of Criminal Procedure provides a standard for the acceptance in federal courts of a plea of guilty. It expressly directs that the trial court shall not accept a plea of guilty without first inquiring and determining that the plea is voluntary and whether defendant understands the nature of the charge against him and is aware of the consequences of his plea. The holding in Boykin v. State of Alabama, supra, is to the effect that Rule 11 embodies principles of federal constitutional due process which are applicable to the states.

In McCarthy v. United States, supra, the court recognized that there was a difference of opinion among the courts of appeal regarding the effect of noncompliance with this rule. If voluntariness could not be determined from the record, it was the practice in certain circuits to remand for evidentiary hearing on the issue. In other circuits if a district court did not comply with the rule, the guilty plea was set aside and the cause was remanded for another hearing at which it was permissible for defendant to replead. Adopting the latter rule, the court in the McCarthy case said: "From the defendant's perspective, the efficacy of shifting the burden of proof to the Government at a later voluntariness hearing is questionable. In meeting its burden, the Government will undoubtedly rely upon the defendant's statement that he desired to plead guilty and frequently a statement that the plea was not induced by any threats or promises. This prima facie case for voluntariness is likely to be treated as irrebuttable in cases such as this one, where the defendant's reply is limited to his own plaintiff allegations that he did not understand the nature of the charge and therefore failed to assert a valid defense or to limit his guilty plea only to a lesser included offense. No matter how true these allegations may be, rarely, if ever, can a defendant corroborate them in a post-plea voluntariness hearing." This rule, said the court in the Boykin case, "forestalls the spin-off of collateral proceedings that seek to probe murky memories."

It appears that there had been plea discussions and an agreement to reduce the charged offense of murder to manslaughter in the first degree. Defendant was interrogated at his arraignment as follows: "THE COURT: You're not guilty of murder? DEFENDANT: No. THE COURT: * * * Now, Mr. Brech, included within the crime of murder is a lesser crime known as manslaughter in the first degree. I'll ask you now, are you guilty or not guilty of manslaughter in the first degree? You have to answer that. DEFENDANT: Yes." The court then directed entry of plea of guilty to manslaughter in the first degree. There is a serious question whether the answer "Yes" to the compound question is a trustworthy and sufficient record of a plea of guilty. Even if the answer was equivalent to a plea

of guilty, there is no valid record at the time of the arraignment that the plea was made voluntarily and knowingly. A plea of guilty, a confession in open court, is subject to no less stringent test than that applicable to a simple confession. See State v. Hinz, 78 S.D. 442, 103 N.W.2d 656; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205. In either case voluntariness requires that the confession be not induced by a promise or a threat and that it be in fact voluntarily made. The court is not relieved of such duty because defendant is represented by counsel. United States v. Lester, 2 Cir., 247 F.2d 496; United States ex rel. Elksnis v. Gilligan, D.C., 256 F.Supp. 244. And no matter how overwhelming the proof of guilt may appear, the ascertainment of voluntariness and understanding as a matter of due process must be made at the arraignment. United States v. Tateo, D.C., 214 F.Supp. 560.

The court concludes that a mere deviation from statutory procedure in arraignment and entry of plea does not amount to denial of due process. I agree that a particular ritual is not necessary, but this does not end the matter. Whatever the procedure followed, for a plea of guilty to be valid under federal standards binding on state courts, it must fairly appear from the record that the plea of guilty was made voluntarily and knowingly. Boykin v. State of Alabama, supra. Because the record does not affirmatively so show, I am impelled to dissent. I would reverse and remand with directions to vacate the judgment and to permit defendant to replead.