STATE of South Dakota, Plaintiff
and Appellee,

v.

Fidel H. ARGUELLO a/k/a Fred
Arguello, Defendant and
Appellant.

No. 17835.

Supreme Court of South Dakota.

Argued March 16, 1993.

Filed June 23, 1993.

Mark Barnett, Atty. Gen., Charles D. McGuigan, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Terry L. Pechota of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for defendant and appellant.

SABERS, Justice.

This case arises out of a fight involving Fred Arguello (Arguello), David High Crane (High Crane) and Dale Poor Thunder (Poor Thunder) during the early morning hours of August 3, 1991 in the parking lot of DD's Shortstop, a bar in Rapid City. Both High Crane and Poor Thunder sustained stab wounds. The stab wound to High Crane resulted in his death.

## FACTS

The State's version and Arguello's version of the facts differ substantially. The State's version is that during an argument, Arguello attacked and stabbed High Crane and Poor Thunder. According to Arguello, he stabbed High Crane and Poor Thunder in self-defense because they wanted his truck. We consider these differences resolved by the jury's verdict in favor of the State.

Following a five-day jury trial, Arguello was found guilty of first-degree manslaughter for the death of High Crane and aggravated assault upon Poor Thunder. He was sentenced to ninety years in the state penitentiary for manslaughter and fifteen years for aggravated assault. The sentences run concurrently.

Arguello appeals, raising ten issues.

1. Whether the State's release of his pickup and the claimed loss of exculpatory evidence denied him a fair trial.

■ According to Arguello, after he was attacked by Poor Thunder and High Crane, he ran to his pickup in the parking lot of the bar in an attempt to escape. When he arrived at his pickup, he claims he found the driver's side door open and the back window on the passenger side broken. After throwing the knife and tire iron into the back of the pickup, Arguello fled the scene in the pickup. The police took possession of the pickup after Arguello's arrest. There was testimony that none of the windows on the pickup were broken. The pickup was later released by the State to the mortgagee bank.

■ Arguello filed a motion to dismiss due to destruction of evidence. According to Arguello, the State's failure to follow release of evidence procedures as to his pickup denied him a fair trial. He argues that, because his attorney was never notified that the pickup was going to be released, he was unable to conduct an independent examination of the pickup for evidence, including fingerprints and fibers placing Poor Thunder, High Crane, Tony Cook (Cook) or others inside or near the pickup. The trial court denied his motion, finding that, while the State did release the pickup without notifying him, the State was acting in good faith and any evidence that may have been lost by the release was not exculpatory.

SDCL 23A–37–15 provides:

Before any property is returned to the owner pursuant to § 23A–37–14, the law enforcement personnel in possession of the property shall notify the defendant that the property will be returned to the owner. Upon a motion made by the defendant and upon good cause shown that the property contains exculpatory evidence of the defendant's innocence, the court may order the law enforcement personnel in possession of the property not to release it to the owner.

The State's violation of SDCL 23A–37–15 "does not automatically vitiate the convic-

tion." *State v. Lyerla*, 424 N.W.2d 908, 911 (S.D.1988) (citation omitted). The State's destruction of evidence favorable to Arguello is a violation of due process if the evidence requested by Arguello and destroyed by the State is material either to guilt or punishment. *Id.* at 910 (citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). The state's duty to preserve evidence is

limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, *and* be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984) (footnote omitted) (citation omitted) (emphasis added). Additionally, Arguello must show that the State acted in bad faith in releasing the pickup. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988).

The record indicates that the State conducted lab tests on various specimens and items including those taken from Arguello's pickup. The results were provided to Arguello. If Arguello felt that the pickup contained additional evidence which may have been exculpatory in nature, he had an opportunity to conduct his own forensic analysis before the pickup was released to the bank. According to the State at the Motions Hearing, the pickup was held by the State for a "considerable period of time." The State released the pickup only after Arguello's creditor brought a civil proceeding to gain title to the pickup. Presumably, Arguello was notified of this proceeding. Additionally, the State offered to assist Arguello in getting the pickup returned. If Arguello believed the pickup contained exculpatory evidence, he should have actively conducted his own forensic examination prior to the release of the pick-

up or have accepted the State's offer to assist him in getting the pickup returned. We do not find that the release of Arguello's pickup resulted in the loss of "evidence that might be expected to play a significant role" in his defense.

2. Whether the denial of the motion to sever the murder charge from the aggravated assault charge was error.

■ Arguello moved to sever the counts and separate the trials. In support of his motion, he argued that the charges were different in character, involving different victims and different factual scenarios. Additionally, he claimed severance was necessary because, while he *might* want to testify regarding the knifing of High Crane, he *might* not want to testify concerning the knifing of Poor Thunder. The court denied his motion to sever finding that the probative value of holding a joint trial outweighed any prejudicial effect.

"[T]he decision not to sever is firmly within the discretion of the trial court and absent a clear showing of prejudice to substantial rights of the defendant, there is no abuse of that discretion." *State v. Dixon*, 419 N.W.2d 699, 702 (S.D.1988) (citations omitted).

SDCL 23A–6–23 provides:

Two or more offenses may be charged in the same indictment or information in separate counts for each offense, if the offenses charged, whether felonies or misdemeanors or both, *are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.*

(Emphasis added.) Contrary to Arguello's claim that "the charges involved different factual scenarios" and "were two distinct acts or transactions under [SDCL] 23A–6–23," we find the two offenses "are based on the same act or transaction or on two or more acts or transactions connected together[.]" *Id.* This satisfies the statutory test for joinder.

Any joinder of offenses is apt to involve some element of prejudice to the defendant, since a jury is likely to feel that a defendant charged with several crimes must be a bad individual who has done something wrong. However, if the notion of involuntary joinder is to retain any validity, a higher degree of prejudice, or certainty of prejudice, must be shown before relief will be in order.

*Dixon*, 419 N.W.2d at 703 (citation omitted). Arguello's claim that he *might* want to testify concerning the murder charge but not the aggravated assault charge and that failure to sever prevented this is insufficient to establish the required "higher degree of prejudice, or certainty of prejudice[.]" *Id.* Additionally, the jury was instructed by the court to consider each count separately. Arguello has failed to show an abuse of discretion in denying his motion to sever.

3. Whether denial of his motions to change venue was error.

■ Arguello claims denial of his motions to change venue denied his right to a fair and impartial trial under the Fourteenth and Sixth Amendment to the United States Constitution and Article VI, § 7 of the South Dakota Constitution. He argues change of venue was necessary because of prejudicial pretrial and trial publicity in the local press which was precipitated in part by comments of the State and its officers.

■ "The law presumes that a defendant can receive a fair trial in the county in which the offense is committed." *State v. Weatherford*, 416 N.W.2d 47, 50 (S.D.1987) (citations omitted). The burden of establishing the necessity of a change in venue is upon the Arguello. *Id.* (citations omitted). It shall be granted at the discretion of the trial court and "we will reverse that decision only for abuse of discretion." *State v. Wellner*, 318 N.W.2d 324, 331 (S.D.1982) (citations omitted).

"Pretrial publicity alone is not enough to deny a fair trial or, in other words, to warrant a change in venue." *Weatherford*, 416 N.W.2d at 50–51 (citations omitted). "If the jurors were unaware of the pretrial publicity or could not recall it, or if knowledge of the publicity did not cause a

prejudicial opinion to be formed, a change of venue would be unwarranted." *Id.* at 51 (citations omitted).

Arguello's claim that the jury could not have convicted him of aggravated assault on the basis of the evidence presented unless it was affected by the pretrial publicity is without merit. The trial judge granted Arguello's request to conduct individual voir dire of those jurors who had knowledge of the case. While five jurors who had heard about the case were on the jury, Arguello has failed to demonstrate that they had formed a prejudicial opinion. In *Weatherford*, eight of the twelve jurors chosen had read or heard about the case. On appeal, this court found no abuse of discretion on the part of the trial court in denying the motion for change of venue. *Id.* at 52. Arguello has failed to meet his burden. We find no abuse of discretion.[1]

4. Whether denial of his motion to strike the testimony of Poor Thunder was error.

■ After Poor Thunder testified, Arguello moved to strike his testimony on the grounds that he admitted giving prior perjurious testimony and his testimony was inherently incredible, untrustworthy, and unreliable. His motion was denied.

Generally, every person is competent to be a witness, SDCL 19–14–1, if they have personal knowledge of the matter, SDCL 19–14–2, and they have sufficient understanding to receive, remember, and narrate impressions, and are sensible to the obligation of an oath. The determination of the witness' competency is within the discretionary power of the trial judge and may be reversed only upon a showing of abuse of discretion.

*State v. Lufkins*, 381 N.W.2d 263, 266 (S.D. 1986) (citations omitted).

■ It is the function of the jury, not this court, to resolve conflicts in the evidence, determine witness credibility, and weigh the evidence. "[W]e afford the strongest presumption in favor of the jury's determination of credibility." *State v. Svihl*, 490 N.W.2d 269, 274 (S.D.1992). Poor Thunder's testimony was sufficiently credible for the jury to consider and Arguello has failed to overcome this presumption. See also text of Issue 9 on sufficiency of evidence.

5. Whether denial of his motion to suppress identification testimony was error.

■ Shortly after the stabbings, witnesses Bernadine Jones (Jones) and Cheryl White Dress (White Dress) were taken to the police station. After naming Arguello as the individual involved in the fight, they were shown a picture of him in order to confirm that this was the same individual who committed the crime. Arguello claims that both Jones and White Dress were shown a single photograph of him with the explanation that he was the person involved in the incident. This is an inaccurate recitation of the facts. Both Jones and White Dress testified at the Motions Hearing that, at the time they were shown the police photograph of Arguello, the police had not named Arguello as the individual involved in the fight and seen by Jones and White Dress. The testimony of a detective confirmed this.

In-court identifications will be suppressed when they stem from a procedure that is so impermissibly suggestive as to result in a very substantial likelihood of irreparable misidentification. The party seeking to suppress the in-court identification bears the burden of establishing the impermissible suggestiveness of the identification procedure. The suggestiveness of the procedure is evaluated by examining the totality of the circumstances surrounding the identi-

---

1. Arguello also argues that the trial court erred in refusing to pay for a survey of the public opinion in Pennington County.

The refusal of the trial court to grant a motion for a public opinion survey rests within the sound discretion of the trial court. . . . .

We do not believe the trial court abused its discretion in denying defendant's motion for a survey. Voir dire examination is the better forum for ascertaining the existence of hostility towards the accused.

*Weatherford,* 416 N.W.2d at 52 (citations omitted).

fication procedure. Under the totality of the circumstances, if there is not a very substantial likelihood of irreparable mis-identification, then the reliability of an in-court identification is for the jury to weigh.

*State v. Hanson,* 456 N.W.2d 135, 138 (S.D. 1990) (citations omitted).

We agree with the trial court that "the identifications were from the independent knowledge of the witnesses with an adequate and reasonable opportunity to observe [Arguello], and the weight to be given those witnesses is up to the jury, not for the court." The trial court did not abuse its discretion in denying the motion because he failed to establish that the identification procedure was impermissibly suggestive.

6. Whether there was an impartial jury trial from a jury which represented a fair cross section of the community.

▮▮▮▮▮ Arguello claims denial of his Sixth Amendment right to a trial "by an impartial jury of the state and district wherein the crime shall have been committed" selected from a fair cross section of the community. According to Arguello, there was an under-representation of Indians and Blacks on the jury panel from which the jury was drawn. The burden is upon Arguello to make a prima facie showing that the cross-sectional requirement has not been met. *State v. Lohnes,* 432 N.W.2d 77, 83 (S.D.1988) (citations omitted).

To establish a prima facie challenge[, Arguello] must show that: (1) the group excluded is a "distinct" group in the community; (2) the representation of this group in jury pools is not fair and reasonable in relation to the number of such persons in the community; (3) this under-representation is due to the systematic exclusion of the group from the jury-selection process.

*Id.* at 83–84 (citations omitted).

Arguello represents that, according to 1990 census figures, 7.1% of Pennington County was American Indian and 1.6% was Black. The venire from which his jury was selected contained 119 people, 2 of whom indicated they were Indian. Therefore, according to Arguello, the venire was comprised of 1.68% American Indians and 0% Blacks, resulting in a disparity and under-representation of American Indians of 5.5%.

There is no doubt that American Indians are a distinct group in the community but Arguello has failed to establish either the second or third prong of the *Lohnes* test. We cannot determine, based upon the statistics provided, "whether the representation of Indians on the voter registration list[, which is the jury selection list,] is fair and reasonable in comparison with others. We will not presume that the source for jury selection fails to provide a fair cross-section of the community, absent adequate proof." *Id.* at 84 (citation omitted). While "[a]n 'inherent' exclusion of Indians from the jury selection process may also be found with statistical evidence showing that the voting list results in an under-representation of Indians," *Id.* (citation omitted), Arguello has not provided any statistics regarding the percentage of American Indians registered to vote.

The composition of the panels, upon which Arguello relies, is irrelevant. A panel is selected *at random* from the master jury list, *see* SDCL 16–13–27 [2], which is a "list of names randomly selected by the board of jury selectors from the jury selection lists[.]" SDCL 16–13–9.1.[3] Because

---

**2.** SDCL 16–13–27 provides:

The drawing officers shall verify the clerk's tickets corresponding to all the names on the master jury list. Separate tickets corresponding to all such names shall be placed in the jury wheel or drawing box, shall be thoroughly mixed, and shall be drawn one at a time and in rotation by the register of deeds, treasurer, and sheriff, or their designees, until the required panels have been filled. As each name is drawn it shall be recorded by the clerk and the com-

pleted list shall be signed by the drawing officers.

The drawing officers may use an electronic or mechanical system or device in carrying out their duties pursuant to this section.

**3.** In 1992, SDCL 16–13–9.1 was amended to provide in part:

[T]he master juror list shall be that list of names randomly selected by the board of jury selectors from the jury selection lists *and the driver li-*

the master jury list is selected *at random* from the current precinct registration list (jury selection list), *see* SDCL 16–13–4.1, it may not accurately indicate the percentage of American Indians registered to vote. Theoretically, a panel could be composed entirely of women, men, blacks, whites, American Indians, or any combination. Arguello has failed to show that the process was not random or that it was due to the systematic exclusion of the group from the jury-selection process. *Lohnes*, 432 N.W.2d at 83–85.[4]

7. Whether he was properly bound over on the charge of aggravated assault.

Arguello argues that Poor Thunder's statement to the police was improperly admitted at the preliminary hearing and the court did not have sufficient probable cause to bind him over on the aggravated assault charge. Since the jury found Arguello guilty of aggravated assault, his argument is moot. "[A] finding by a jury of guilt beyond a reasonable doubt eliminates any question of probable cause to bind the defendant over for trial." *State v. Runge*, 89 S.D. 376, 384, 233 N.W.2d 321, 325 (1975).

8. Whether statements by High Crane and Poor Thunder constituted inadmissible hearsay.

Arguello claims that the trial court abused its discretion by admitting the hearsay statements made by Poor Thunder and High Crane moments after they were stabbed. Elizabeth Hairy Shirt and Cook testified that High Crane said, "Help me."

and "He stabbed me." White Dress testified that she heard Poor Thunder say, "I'm hurt. Help me. Help me. He stabbed me too." And Cook testified that Poor Thunder said, "He got me." "He got me too." and pointed to Arguello's truck and said, "That truck, right there. Get him."

"The evidentiary rulings of a circuit court will be disturbed only if the court abused its discretion." *State v. Phillips*, 489 N.W.2d 613, 616–17 (S.D.1992) (citations omitted). A trial court, however, does not abuse its discretion when it admits hearsay statements which relate "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition[.]" SDCL 19–16–6.[5] *State v. Orelup*, 492 N.W.2d 101, 106 (S.D.1992). " '[T]he critical inquiry is whether they (the declarations) were made while declarant was still under the influence of the experience.' " *State v. Brings Plenty*, 490 N.W.2d 261, 264 (S.D.1992) (quoting *State v. Percy*, 80 S.D. 1, 7, 117 N.W.2d 99, 102 (1962)).

In *Orelup*, we stated that the trial court erred in admitting testimony without first determining whether the statements were related to a startling event and made under the stress of excitement. *Orelup*, 492 N.W.2d at 106. Arguello claims the trial court similarly erred in failing to make the required findings. This is incorrect. The trial court admitted this testimony as substantive evidence on the basis of res gestae[6] after finding the comments reliable and trustworthy as spontaneous and contemporaneous statements. While the trial court should have referred to this excep-

*cense lists*, from which the various grand and petit jury panels shall be drawn. (Emphasis added.)

**4.** Arguello argues that his right to a fair trial was denied under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) by the State's illegal removal of the only two Indians on the panel. The State's brief claims both were preempted for appropriate reasons. Because Arguello did not object to the removal of either of these individuals at trial, he has failed to preserve this issue for appeal. *See Smolnikar v. Robinson*, 479 N.W.2d 516, 518–19 (S.D.1992) (citations omitted).

**5.** SDCL 19–16–6 provides:

A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, is not excluded by § 19–16–4, even though the declarant is available as a witness.

**6.** Res gestae is "[a] spontaneous declaration made by a person immediately after an event and before the mind has an opportunity to conjure a falsehood. It represents an exception to the hearsay rule and should be referred to as a spontaneous exclamation rather than res gestae." Black's Law Dictionary 1173 (5th ed. 1979).

tion as the excited utterance exception, Arguello has failed to demonstrate that it was an abuse of the trial court's discretion to refer to the exception as res gestae.

9. Whether there was sufficient evidence to submit the charges of second-degree murder and aggravated assault to the jury or for conviction.

"In determining the sufficiency of the evidence on appeal the only question presented to this court is whether or not there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilty beyond a reasonable doubt." *Lufkins*, 381 N.W.2d at 268 (citation omitted). In "mak[ing] this determination, we accept the evidence and the most favorable inferences fairly drawn therefrom which will support the verdict." *Svihl*, 490 N.W.2d at 274 (citations omitted); *State v. Sickler*, 334 N.W.2d 677, 678 (S.D.1983) (citation omitted).

Arguello and the State offer conflicting explanations of the sequence of events. The outcome of the case depends upon the believability of the witnesses. As noted previously, it is the function of the jury, not this court, to resolve conflicts in the evidence, determine witness credibility, and weigh the evidence. *Svihl*, 490 N.W.2d at 274 (citation omitted). The jury, not this court, was able to view the witnesses and their demeanor during both direct and cross examination.

> [W]e afford the strongest presumption in favor of the jury's determination of credibility.... [T]he jury heard all the testimony offered by State and resolved any conflicts in the evidence in State's favor. Our review of the record reveals abundant evidence which is sufficient to sustain the jury's finding of [Arguello's] guilt beyond a reasonable doubt.

*Id.*

 Because the jury acquitted him of second-degree murder,[7] Arguello argues

the jury was precluded from finding him guilty of first-degree manslaughter.[8] According to Arguello, the elements for the two crimes are the same. "The crucial distinction between second-degree murder and manslaughter in the first degree is that the former requires a 'depraved mind' as an element of the crime, while the latter does not.... [T]he 'depraved mind' requirement is a genuine additional element which must be established in order to prosecute for second-degree murder." *State v. Primeaux*, 328 N.W.2d 256, 258 (S.D.1982) (citation omitted). Clearly, the jury could find Arguello guilty of first-degree manslaughter and not second degree murder if they found that Arguello did not perpetrate an act "evincing a depraved mind." The elements of the two crimes are not the same.

10. Whether he was sentenced in an inappropriate setting and on the basis of erroneous facts.

 Arguello was sentenced to ninety years in the state penitentiary for first-degree manslaughter and fifteen years, to be served concurrently, for aggravated assault. He argues that this case should be remanded for resentencing because the sentencing court erroneously considered matters made known in an *ex parte* conversation, incident reports from the jail that were never made available to him, and testimony concerning an assault by Arguello in the jail while awaiting trial.

Prior to Arguello's sentencing hearing on January 10, 1992, a scuffle occurred between Arguello and the jailers. Judge Tice asked for an explanation from a jailer, which led to an *ex parte* communication prior to defense counsel's arrival in chambers. Arguello asked for a continuance, which was denied. The State's witnesses

---

7. SDCL 22–16–7 provides:
 Homicide is murder in the second degree when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

8. SDCL 22–16–15 provides in part:
 Homicide is manslaughter in the first degree when perpetrated:
 ....
 (3) Without a design to effect death, but by means of a dangerous weapon[.]

testified in aggravation of sentence to a prior assault by Arguello against an officer in jail and other jail behavior of Arguello. Arguello presented five mitigating witnesses on his behalf.

The court could have sentenced Arguello to life in prison for the first-degree manslaughter conviction. "It is well settled that when a sentence is imposed within statutory limits, the discretion exercised by the trial court in fixing it is generally not reviewable on appeal." *State v. Christians*, 381 N.W.2d 214, 217 (S.D.1986) (citation omitted).

> The sentencing judge may exercise wide discretion with respect to the type of information used as well as its source. He should have full access to the fullest information possible concerning the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record. A sentencing judge's access to information should be almost completely unfettered in order that he may acquire a thorough acquaintance with the character and history of the man before him.

> . . . .

> Due process does not require that the scope of information reviewed by the sentencing judge be controlled by the rules of evidence, and consideration of out-of-court information and hearsay evidence is not precluded.

*State v. Grosh*, 387 N.W.2d 503, 508–09 (S.D.1986) (citations omitted).

Judge Tice stated in the February 12, 1992 motions hearing that his *ex parte* discussion with the jailer prior to Arguello's sentencing did not impact his sentences and that his reason "for inquiry was solely to determine whether or not I should keep him manacled during the period of time for sentencing purposes and control in the courtroom." Although Judge Tice should not have had this conversation outside the presence of Defense Counsel and State's Attorney, it was necessary to maintain order and control in his courtroom. In addition, Arguello was given an opportunity to counter this information and it appears to us that no undue prejudice resulted. We find no reversible error.

While this court has previously held that a trial court's reliance upon erroneous or false information in passing sentence required remanding for reconsideration of the defendant's sentence, *State v. Ellefson*, 287 N.W.2d 493, 496–97 (S.D.1980), this is not such a case. In sentencing Arguello, the court looked to his past, his lies and his propensity to lie, his conduct in jail, and the egregious crimes he had committed and stated:

> Your history of criminal conduct as far as convictions are concerned is limited. But the underlying history is troublesome to this Court; as a juvenile, Youth Forestry Camp, training school, job corps; as an adult, constant problems. It's not just Rapid City in which you've had your problems. It's other communities.

> In trial the jury found that you lied. They found that you were not telling the truth. I fully, totally and completely agree with the jury that your statement was not true. It was a concoction based upon your determination that this is the best way in which you could avoid the consequences for a horrendous crime.

> The crime is horrendous to this Court in that it was a crime of violence, and as counsel stated, there is no reason why you would kill Mr. High Crane. I can sort of understand why you would have stabbed Mr. Poor Thunder because that was after you had killed his friend.

> I believe there was no gang or no group of individuals gathering around you. Mr. High Crane was simply asking for a ride home, and for whatever reason, you developed an antagonism against him and you chose to utilize the knife which you had at the time. There was no mutual combat. There was no threat to you in any way, shape or form in the opinion of the Court, and your story is entirely fabricated.

It's the opinion of this Court that your conduct in jail has been outrageous. It displays no signs of contrition on your part, no willingness to accept or comply with appropriate standards of conduct within the community, within an environment in which you should have no choice. But you still insist upon conducting yourself in a violent fashion even after the killing of another human being and the stabbing of a second.

You threaten officers. You repeatedly spit in their face, repeatedly assaulted officers, repeatedly refused to cooperate.

I have reviewed the history in the Pennington County Jail and I'm satisfied you have intentionally not cooperated and made frequent threats. You have a basic problem in the mind of this Court. You cannot control your emotions. You're a very disturbed young man. You believe everyone hates you and you're incapable of doing otherwise at this point.

I do not believe this sentence should be for retribution, to deter individuals, or rehabilitation. I think the only thing I can do is treat you as a dangerous individual, potentially dangerous individual.

Arguello has not shown that his opportunity to counter aggravating testimony was inadequate or that his sentence was based upon inaccurate information. *See Grosh*, 387 N.W.2d at 509. We affirm.

WUEST and AMUNDSON, JJ., concur.

MILLER, C.J., concurs specially.

HENDERSON, J., concurs in part and dissents in part.

MILLER, Chief Justice concurring specially.

Although I am in full agreement with the majority opinion, I must state that we should not dignify Issues 2, 3, 4, 5 or 7, with a writing, as each is appropriate for summary affirmance under SDCL 15–26A–87.1. To elevate their supposed merits with writings is a waste of valuable time and paper, serving only to increase the wealth of West Publishing Company.

HENDERSON, Justice (concurring in part, dissenting in part).

I join that part of the decision affirming the conviction for manslaughter and aggravated assault.

I dissent to the treatment of the sentencing procedure and would reverse and remand on the resentencing.

Immediately prior to sentencing, an altercation took place between law enforcement and the defendant. Thereafter, the trial court had ex parte communication with law enforcement concerning this altercation. Defense counsel was in the court room and should have been summoned. Furthermore, there were incident reports submitted to the trial judge concerning Arguello's conduct in jail. These incident reports were not made available to counsel prior to sentencing to ameliorate or rebut same. It appears that from the statements of the trial judge, at sentencing, that matters concerning the altercation and the incident reports were used as a basis for the sentence. Of particular concern, State called one Richard Mareska as a witness. Mareska was an alleged victim of an assault by Arguello in the jail during the time that Arguello was awaiting trial on the homicide charge. Arguello's counsel promptly objected to this testimony for the reason that Arguello was awaiting trial on the alleged aggravated assault and was represented by another attorney on the aggravated assault charge. Defense counsel at the sentencing procedure believed that he could not put Arguello on the stand to rebut the testimony of Mareska. This appears to me to be true for, inter alia, he was not representing Arguello in that case. To place him on the stand could have forced Arguello to incriminate himself.

Defense counsel preserved the record objecting, in essence, to this criminal sentencing procedure for the reason that it was not conducted in a legal, impartial, and unprejudicial atmosphere.

Defense counsel vigorously asserts that Arguello was assaulted while handcuffed enroute to the sentencing hearing. Counsel tried to obtain a continuance, which was

denied, to dull the immediacy of the events which had transpired. Defense counsel also maintained, and still does, that the ex parte conversation with law enforcement immediately prior to sentencing was improper.

Arguello now maintains that the ex parte evidence and the highly emotional events prior to the sentencing had an effect on his sentencing which increased his sentences on the two charges.

The procedure set forth in SDCL 23A–27–9 forbids the imposition of sentence in this fashion. Arguello should have been given an opportunity to be heard and defend and rebut as to both the reports and the ex parte conversation with the trial judge. All matters relied upon by the trial court in the sentencing process, should have been heard in an atmosphere to determine the truthfulness of the reports and the ex parte conversation. It appears to me that *State v. Grosh*, 387 N.W.2d 503 (S.D.1986) supports my conclusion as does *State v. Brech*, 84 S.D. 177, 169 N.W.2d 242 (1969). I also rely upon two federal decisions: *U.S. v. O'Neill*, 767 F.2d 780, 787 (11th Cir.1985) and *U.S. v. Williams*, 668 F.2d 1064, 1072 (9th Cir.1981).

A trial should be conducted in an impartial setting. So should the sentencing aspect. *State v. Weatherford*, 416 N.W.2d 47 (S.D.1987). Arguello, at the sentencing procedure, was denied a meaningful opportunity to be heard. In conclusion, this sentence should be set aside and he should be given an opportunity to rebut the aforesaid evidence, so as to mitigate and defend upon its impact.