**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Wendy Marie OLSON, Defendant and Appellant.**

**No. 15399.**

Supreme Court of South Dakota.

Argued March 25, 1987.

Decided June 24, 1987.

Frank Geaghan, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

James A. Eirinberg, Sioux Falls, for defendant and appellant.

MILLER, Justice.

Wendy Marie Olson (Olson) appeals her conviction of attempted distribution of one-half ounce of cocaine. We affirm.

In late November, 1985, Troy Tordsen (Tordsen), an informant, gave the Sioux Falls Police Department information indicating Olson was involved in cocaine trafficking. Tordsen agreed to make taped telephone calls to the defendant and her

roommate Jean "Sugar" Rogers (Rogers) in which cocaine trafficking was discussed. In December 1985, Ray Dunn (Dunn), a DCI agent stationed in Brookings, South Dakota, traveled to Sioux Falls, South Dakota, to assist in undercover work on the Olson case. Dunn met with Tordsen and a sergeant from the Sioux Falls Police Department, after which another telephone call was placed to Olson in which Tordsen attempted to arrange a cocaine purchase. In this call, Tordsen made arrangements with Olson for himself and Dunn to meet her that evening at her residence. The police department provided Dunn with $2,600 in buy money and a suitcase containing a scale, cocaine tester, and other drug paraphernalia.

Dunn and Tordsen arrived at the women's residence at approximately 6:20 p.m. December 6, 1985. Dunn posed as a college student from South Dakota State University in Brookings. After introductions were made, the four moved to a bedroom, apparently so that children in the house would not witness their conversations. Rogers searched Dunn to insure he was not wearing a concealed listening device. After satisfying herself that Dunn was "okay," Olson asked how much cocaine he wished to purchase. Dunn responded he could only afford one ounce. Dunn then showed Olson the scale at her request.

The women apparently then wished to discuss the buy in private and requested that Tordsen and Dunn leave the room. After a few minutes, Olson exited the bedroom and returned to the living room where the men were waiting. She stated Rogers was making some phone calls and explained how the deal would take place. She and Tordsen would take Dunn's money to Worthington, Minnesota, where Olson had previously arranged the use of a motel room. They would return to Sioux Falls with the cocaine about two and one-half hours after they left the house. Dunn indicated he was nervous about letting the money out of his sight for that length of time. When he asked whether Tordsen would be present during the transaction, Olson replied he would be allowed to sample the cocaine but not witness any money changing hands.

Although the testimony is not totally clear, Rogers apparently informed the group that she was unable to arrange a deal in Worthington. Olson then asked Dunn whether he would be willing to travel to St. Paul, Minnesota. Dunn replied he could not as he was expected back in Brookings by 10:00 p.m. Olson then called Terry LaBore (LaBore) in Sioux Falls. She told LaBore she was "looking for some" and wanted to know whether she could "make a deal on an ounce." After hanging up, Olson told Dunn that LaBore expected $3,500 for an ounce of cocaine. Dunn responded he was not willing to pay that much. She asked how much he would pay and he responded he might go as high as $1,500 for half an ounce. Olson suggested that if she dealt with LaBore face to face she could possibly make a bargain. Olson stated she and Rogers would pick up LaBore and drive him to his source of cocaine. One of the women estimated they would return to the house in one-half hour.

Prior to leaving the house, one of the women asked Dunn if they could take along his suitcase containing the drug paraphernalia. Dunn agreed and showed them how to use the cocaine tester. He also gave Olson the $1,500. After this, Olson walked over to a chest of drawers and removed a small caliber revolver. She talked briefly with Rogers regarding whether it was necessary to take the gun along on the deal. Concluding they "better take it along," Olson dropped the revolver into a purse Rogers was holding, they left the house at approximately 8:00 p.m.

After Olson and Rogers left, undercover surveillance officers witnessed their vehicle stopping at LaBore's residence, whereupon LaBore apparently got into the vehicle. The party drove to another residence and made various stops until LaBore exited the vehicle at a liquor store. The vehicle next stopped at a pay phone in front of a Sioux Falls motel.

Meanwhile, Dunn and Tordsen remained at Olson's residence. At 8:40 Tordsen received a phone call from Olson instructing

the men to meet her and the others at the intersection of two streets. Upon sighting the women, Dunn pulled his car up alongside theirs. He demanded to know what was going on. Olson stated the police were watching LaBore and that she spotted one of the surveillance vehicles. Fearing he was losing control of the situation, Dunn demanded return of the money and drug paraphernalia. The women returned the money, but assured Dunn the deal could still take place. One of the women stated they should drive around awhile and attempt to lose the surveillance vehicles. The women instructed Dunn to wait about five minutes, and then return to their residence. Instead, the men drove around a few minutes, informed a police officer what had taken place, and returned to the police station.

The women were arrested at their home and taken to the station. When police officers asked Olson what her intentions were when she left her home that night, she responded that she and Rogers were going to pick up LaBore and obtain half an ounce of cocaine which they would resell to Dunn. She informed the police they would be willing to cooperate with them in attempting to purchase the cocaine from LaBore. She told the police that LaBore was supposed to call the women at their home five minutes after he was dropped off to tell them if it was "cool" for the deal to proceed. At the request of the police officers, the women agreed to place a call to LaBore to set up the transaction, but were unable to reach him.

Olson and Rogers were charged as codefendants with attempted distribution of a controlled drug. Rogers pleaded guilty. Olson was convicted by a jury and sentenced to three years imprisonment.

## ISSUES

Olson asserts the trial court erred in admitting evidence of the fact she ran an escort service; of her possession of a handgun; by failing to require the State to produce Tordsen at trial; in instructing the jury; and in denying her motion for judg-

ment of acquittal based on insufficiency of the evidence.

## DECISION

### EVIDENCE DEFENDANT RAN ESCORT SERVICE

Olson first challenges her conviction on the basis that the trial judge incorrectly allowed the fact that she ran an escort service to go before the jury. Olson's counsel made a motion in limine to exclude the evidence, which was denied at a pretrial motion hearing. Defense counsel renewed his objection the day of trial prior to voir dire, and the trial court again denied the motion. During opening statements, the prosecutor told the jury that Olson ran the escort service known as Pleasure One. Although the opening statements were not transcribed, the State does not deny the reference. Actual evidence of the service apparently was placed in front of the jury by playback of recordings of taped telephone conversations in which a person answered "Pleasure One" (although no mention was made of the nature of the service). These references were not objected to by Olson's counsel.

According to Olson, the prosecutorial statements and evidence of the escort service was improper character evidence, irrelevant, or if relevant, its probative value was substantially outweighed by its prejudicial effect upon the jury. (Counsel suggests the jurors would equate an escort service with prostitution and be more likely to convict Olson simply because she was a bad person.) State argues instead that Olson waived this issue by failing to object when the references were made. Olson argues her motions in limine were adequate to preserve the issue, and that objecting when the evidence was admitted would have compounded Olson's unfavorable exposure to the jury.

■ We agree with the State that Olson has waived the right to complain. Reversible error cannot be predicated upon the denial of a motion in limine. *State v. McKee*, 312 N.W.2d 907 (Iowa 1981); *State v. McNeal*, 699 S.W.2d 457 (Mo.App.1985);

*State v. Pointer,* 224 Neb. 892, 402 N.W.2d 268 (1987); *State v. Maurer,* 15 Ohio St.3d 239, 473 N.E.2d 768 (1984); *Woodard v. State,* 696 S.W.2d 622 (Tex.App.1985). *See* SDCL 19–9–3. Not having specifically objected to the taped conversation in which Olson's phone was answered "Pleasure One" therefore forecloses her from complaining now. Also, since no record was made of the prosecutor's statement, we have nothing to review. *State v. Koenig,* 333 N.W.2d 800 (S.D.1983), *cert. denied* 464 U.S. 940, 104 S.Ct. 354, 78 L.Ed.2d 318 (1983); *State v. O'Connor,* 265 N.W.2d 709 (S.D.1978). Counsel claiming error has an obligation to assure that a record is made. In this case the issue could have been preserved by making a record at the next recess.

### ADMISSION OF PISTOL EVIDENCE

Olson next argues the trial court incorrectly overruled her objection to Dunn's testimony revealing that she and Rogers took a pistol with them the night in question. The trial court denied Olson's motion in limine regarding this evidence. Unlike the escort service evidence, however, Olson also objected during trial when Dunn testified regarding the revolver. Questions of the relevance of proffered testimony are committed to the discretion of the trial court and this court will not reverse its ruling absent an abuse of discretion. *State v. McDowell,* 391 N.W.2d 661 (S.D.1986).

We have recently ruled on a similar issue. In *State v. Rufener,* 401 N.W.2d 740 (S.D.1987) (*Rufener II*), the defendant appealed his conviction of distribution of marijuana. In Rufener's trial the state introduced a pistol found in a search of Rufener's rented vehicle. Although the vehicle was used in committing the crimes charged, the gun was in no other way tied to committing the offenses. We held that the pistol "paraded before the jury, and admitted as substantive evidence, did not

have any tendency to make the existence of any fact that is of consequence to the determination of whether Rufener distributed [an illegal drug] more probable or less probable than it would be without the pistol." 401 N.W.2d at 743.

Olson urges that *Rufener II* controls the present case. We believe, however, that the present case is readily distinguishable. First, the gun was never located and therefore it was never "paraded before the jury" nor received into evidence. Secondly, testimony of its existence was relevant to show preparation to commit the crime and intent—the women were on their way to purchase illegal drugs, carrying a large amount of cash. There was also the conversation between the women in which they discussed the need to bring the gun on their outing. In short, this case is different than *Rufener II* because the weapon was directly tied to the crime.

We also disagree with Olson's counsel that evidence regarding the pistol should have been excluded on the alternative ground that it was improper bad act evidence under SDCL 19–12–5, and that the trial court failed to balance the probative versus prejudicial value of the gun. Of course, prior to determining whether evidence is admissible as bad act evidence, the trial court must determine its relevancy, and "balance its probative value against the risk of unfair prejudice." *State v. Dace,* 333 N.W.2d 812, 817 (S.D.1983). *See also, e.g., State v. Pedde,* 334 N.W.2d 41 (S.D.1983). The record is silent regarding any balancing by the trial court.[1] Fortunately for State's position, a balancing was not required. We initially observe that possession of a handgun is not illegal. Many fine citizens legally possess handguns. More importantly, the evidence was offered not as other bad acts but merely to show plan, preparation and intent.

---

1. The comment by the trial court in ruling on the pistol's admissibility could hardly be elevated to the level of a "balancing." In denying defense counsel's motion, the court stated: "... it is obvious they weren't carrying [a gun] to go pheasant hunting. In view of the fact that there is apparently a frisking and so forth going on, I think I will deny the motion and let the jury draw whatever conclusions may come from it."

## STATE'S FAILURE TO MAKE TORDSEN AVAILABLE

■ On March 17, 1986, Olson filed a motion to compel discovery of, among other things, the name and address of Tordsen. The court entered an order granting this motion on April 24, 1986. On May 23, 1986, Olson filed a motion for continuance. She claimed State had only recently complied with the discovery order and that she had made a diligent but unsuccessful effort to locate Tordsen and needed more time to find and interview the informant. The trial court denied the motion for continuance and the trial began May 26th. Olson argues this detracted from the preparation of her defense.

"The granting or refusing of an application for a continuance is entirely a matter in the discretion of the trial court, and there is no error unless a manifest abuse of discretion is shown." *State v. Bittner,* 359 N.W.2d 121, 126 (S.D.1984). Dunn testified at trial that he understood Tordsen was someplace in California. Also, the sheriff's department contacted Tordsen's parents in an effort to locate his whereabouts. At least two subpoenaes were issued to compel his attendance. There is no evidence the State failed to make a good-faith effort to produce the whereabouts of Tordsen. Also, Olson gives us no reason to believe Tordsen held information helpful to her defense. The trial court therefore did not abuse its discretion in denying the motion for continuance.

## INSTRUCTIONS

■ Olson next attacks certain instructions given by the trial court. She first challenges Instruction No. 7 which read:

It is provided by a statute of this state that every person who attempts to commit any crime and in such attempt does any act towards the commission of such crime, but fails or is prevented or intercepted in the perpetration thereof, is punishable as provided by law.

This instruction was taken verbatim from South Dakota Pattern Jury Instruction 3-7-90 (1970). According to Olson, this instruction misled the jury and was an incor-

rect statement of the law "because it states that *any* act would constitute sufficient acts toward the commission of the attempt of the crime." She argues the instruction could include prepatory acts as being sufficient to constitute an attempt. We disagree. To begin with, the language from the instruction complained of is substantially the same as SDCL 22–4–1. Olson therefore cannot complain that the instruction failed to relate to the jury the law of this state. Furthermore, a subsequent instruction informed the jury of the necessity to distinguish between mere preparation and acts which are sufficient to constitute an attempt to commit a crime. It is well settled that a trial court's instructions shall be taken as a whole to determine if they accurately state the law. *E.g., State v. Weisenstein,* 367 N.W.2d 201 (S.D.1985); *State v. Fender,* 358 N.W.2d 248 (S.D.1984).

■ Olson next complains of the following language of Instruction No. 8:

The essential elements of the offense of attempting to commit the crime as charged in the Indictment each of which the state must prove beyond a reasonable doubt, are:

.    .    .    .    .

2. That at the time and place alleged in the Indictment she did a direct act ... toward the execution of the crime[.]

She states this instruction (very similar to South Dakota Pattern Jury Instruction 3-7-90a (1970)) also failed to accurately state the law of attempt. Specifically, the instruction failed to satisfy Olson because it did not state that: (1) the direct act towards the commission of the crime must go beyond mere preparation; (2) the acts must not be ambiguous or equivocal; (3) the acts must go so far that they would result in the accomplishment of the crime charged unless frustrated by extraneous circumstances. We agree that these rules embody the law of attempt in this state. *See Fender, supra; State v. Martinez,* 88 S.D. 369, 220 N.W.2d 530 (1974); *State v. Judge,* 81 S.D. 128, 131 N.W.2d 573 (1964). Again, however, we reject her argument because other instructions given by the court em-

bodied these concepts and the instructions given as a whole were therefore correct.[2]

## MOTION FOR JUDGMENT OF ACQUITTAL

As the final challenge to her conviction, Olson argues the trial court incorrectly denied her motion for judgment of acquittal made at the close of State's case. The motion was based on the alleged insufficiency of State's evidence to allow for conviction. The trial judge denied the motion, stating there was sufficient evidence for the attempt issue to be submitted to the jury, and this is the ruling we must review. *State v. Galati*, 365 N.W.2d 575 (S.D.1985); *State v. Kaseman*, 273 N.W.2d 716 (S.D. 1978). In determining the sufficiency of the evidence on appeal in a criminal case, the only question before this court is whether there is evidence in the record which, if believed by the jury, was sufficient to sustain a finding of guilt beyond a reasonable doubt. *Galati, supra; Kaseman, supra.* This court must accept the evidence and inferences fairly to be drawn therefrom which will support the jury's verdict. *E.g., Kaseman, supra.*

■ Applying the foregoing standards to our review, we determine there to be ample evidence to support the jury's verdict. Among this evidence State introduced was Olson's telephone calls made in the attempt to arrange a cocaine purchase in Worthington, Minnesota; of Olson's statements to LaBore that she was "looking for some" and that she wanted to "make a deal on an ounce"; of her suggestion that she drive to LaBore's house to deal with him directly; that she and Rogers drove to various locations in Sioux Falls in an attempt to locate a source of cocaine; of Rogers taking $1,500 from Dunn to use to purchase cocaine; of her arranging for Tordsen and Dunn to meet the women in their car on the street; of her assuring Dunn at this meet-

ing that "the deal could still go down"; and of Olson's statement after her arrest that she intended to purchase cocaine for resale to Dunn on the night Dunn visited her. These acts surely go beyond those undertaken merely in preparation for the purchase of cocaine, and taken together constituted direct and unambiguous acts in an *attempt to distribute* cocaine. In fact, it appears the only thing which prevented Olson from purchasing the one-half ounce of cocaine and reselling it to Dunn was her inability to locate a source of the drug, and her suspicion when spotting what she believed to be surveillance vehicles. As this court stated in *State v. Judge, supra,* an "attempt must be manifested by acts which would end in accomplishment, but for intervening circumstances occurring apart from, and independent of the will of the defendant." 81 S.D. at 132–33, 131 N.W.2d at 575. The jury certainly could have rationally concluded this is what occurred with Olson on the night of her arrest.

Affirmed.

All the Justices concur.

---

**2.** We feel compelled to point out, however, one glaring error in the trial court's instructions. In defining reasonable doubt the court instructed the jurors they must feel convinced to a "moral certainty" that the defendant is guilty. Several years ago in *State v. Brewer*, 86 S.D. 434, 197 N.W.2d 409 (1972), and recently in *State v. Breed*, 399 N.W.2d 311 (S.D.1987), we indicated that "moral certainty" was not the proper reasonable doubt standard. Because we are occasionally seeing this language creep back into instructions, the trial courts are reminded to either annotate their old pattern instruction sets or utilize the new pattern instructions which properly set forth the applicable law.