**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Gregory Scott GALLIPO, Defendant and Appellant.**

No. 16712.

Supreme Court of South Dakota.

Considered on Briefs Feb. 14, 1990.

Decided Sept. 5, 1990.

Craig M. Eichstadt, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger Tellinghuisen, Atty. Gen., Pierre, on brief.

Shelley R. Wieck of Siegel, Barnett & Schutz, Aberdeen, for defendant and appellant.

HENDERSON, Justice.

Gregory Scott Gallipo (Gallipo) appeals his convictions for two counts of first degree rape. We affirm.

## FACTS

Victim, age 26, lived in Aberdeen, South Dakota. On the evening of October 25, 1988, victim and her friend Sharlene went out for dinner at a restaurant in Aberdeen. After they had eaten, the two went on to a local bar called the Silver Dollar. Seated in the Silver Dollar when victim and Sharlene entered were Gallipo, age 22, and his friend Grant. Victim and Sharlene were not acquainted with the two men and seated themselves at a table across the bar from them.

After victim and Sharlene had been in the Silver Dollar for a time, Gallipo and Grant sent the two women drinks and an invitation written on a napkin to, "come over and say hi." Victim and Sharlene joined Gallipo and Grant and introductions were exchanged. The foursome visited for awhile and consumed several drinks. Subsequently, they left the Silver Dollar and proceeded on to another bar called the Spur. After entering the Spur, Sharlene saw another friend and visited with her while victim, Gallipo and Grant played pool. Sharlene and Grant left the Spur separately around 11:00 p.m., leaving victim and Gallipo together in the bar.

At approximately midnight, victim, who lost her ride when Sharlene left, accepted Gallipo's invitation for a lift home. While en route, Gallipo made repeated inquiries as to whether or not victim had a boyfriend waiting at home, to which victim would respond in the negative. After arriving at victim's apartment house, Gallipo walked victim to her door. When victim opened the door, Gallipo, without invitation, followed her inside. Victim turned on the lights and the television set and sat down on the floor where Gallipo joined her.

Victim was watching t.v. and not paying attention to Gallipo when she turned around and discovered that he had removed all of his clothing and was standing naked in the room. Victim did not believe she was immediately threatened but wondered how she could extricate herself from the situation. She told Gallipo, "this isn't go-

ing to go anywhere," and urged him to put on his clothes and leave. Instead, Gallipo sat on the floor next to her and asked her to take off her own clothes. Victim declined but Gallipo, undaunted, attempted to kiss her. Victim pushed at Gallipo and again asked him to leave but he merely got up and walked into the bathroom. Victim continued pleading with Gallipo, trying to reason with him and convince him to go home. Gallipo refused stating, "no, I don't think that's what we're going to do."

Gallipo's manner changed when he emerged from the bathroom. He became aggressive, telling victim he was not leaving. He grabbed her right arm and pulled her into the bedroom, demanding that she take off her clothes. Gallipo still had hold of victim's arm and by this point had become very aggressive. Because of his aggressive manner, victim feared that she would be seriously hurt and submitted to his demand that she remove her clothing.

Gallipo pushed victim down on the bed and held her down, trying to kiss her. When victim resisted by pushing him back, Gallipo became more angry stating, "I know you want this. You're always— you're just like she is, telling me no and you really mean yes." Gallipo continued kissing victim, calling her by his wife's name. Victim continued to struggle with Gallipo, pushing him back but he became even more angry, striking her in the face with his hand and telling her, "quit fighting me. You really want this. Quit fighting me."

During her struggle, victim remembered that the door to her apartment was next to the bathroom. In hope of escape, victim asked Gallipo if she could go to the bathroom. Gallipo argued with her, telling her he was going with her. Finally, he grabbed victim by her hair and pulled her into the bathroom, telling her, "you better go, bitch, or you better get down on your knees." Victim took this as a demand for oral sex. Gallipo then asked victim for

some lotion. Victim replied that she did not have any but Gallipo found a bottle in the medicine cabinet.

After finding the lotion, Gallipo pulled victim back into the bedroom and pushed her down on the bed. He made victim apply the lotion to his penis. Continuing to restrain victim, Gallipo forced her into various acts of oral sex and sexual intercourse. Gallipo maintained his threatening manner throughout these acts. He became upset because victim was crying, telling her to stop and asking, "why are you crying? You're supposed to like this." When Gallipo finished, he became apologetic and remorseful and quickly dressed and left the apartment.

Victim, in shock at this point, quickly locked the apartment door after Gallipo's departure. She attempted to phone a friend in Gettysburg, South Dakota, her hometown, but was so hysterical and incoherent that when her friend told her to call the police she hung up. Victim phoned a second friend in Gettysburg who managed to calm her down and convinced her to call the police. The Aberdeen Police Department received victim's call at approximately 2:00 a.m. and an officer was dispatched to her apartment.

Victim would not open the door when the officer arrived because she was afraid Gallipo was returning. However, she was still on the phone to the police department. Using her phone and the officer's portable radio, a signal was worked out so that when the officer knocked victim would believe it was the police. Victim was hysterical when she let the officer in and was unable to answer his questions. The officer managed to calm her down and she relayed her story. Thereafter, the officer took victim to the hospital for examination and treatment, picking Sharlene up on the way to help comfort victim.

An indictment was filed charging Gallipo with two counts of first degree rape under SDCL 22–22–1(1).* A jury trial was con-

---

\* SDCL 22–22–1(1) provides in pertinent part:

Rape is an act of sexual penetration accomplished with any person other than the actor's

spouse under any one or more of the following circumstances:
(1) Through the use of force, coercion or threats of immediate and great bodily harm

ducted on April 20, 21, 22, 1989. At the close of state's case and after presentation of all the evidence, Gallipo made motions for a judgment of acquittal based upon insufficiency of the evidence. The trial court denied the motions and the jury returned a verdict finding Gallipo guilty of both counts of first degree rape. He was sentenced to a general sentence of six years in the penitentiary on both counts. This appeal followed.

## ISSUE ONE

### DID THE TRIAL COURT ERR IN DENYING GALLIPO'S MOTIONS FOR A JUDGEMENT OF ACQUITTAL? WE HOLD THAT IT DID NOT.

■ Gallipo argues that the evidence is insufficient to sustain his first degree rape convictions and, therefore, the trial court erred in denying his motions for a judgment of acquittal. We disagree.

As we set forth in *State v. Blalack*, 434 N.W.2d 55, 59–60 (S.D.1988), another rape case:

> Our standard of review on a denial of a motion for judgment of acquittal is whether the state set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged. *State v. Farmer*, 407 N.W.2d 821, 825 (S.D.1987). In reviewing the sufficiency of the evidence, we consider the evidence in a light most favorable to the verdict. *State v. Ashker*, 412 N.W.2d 97, 105 (S.D.1987). A guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt. *Id.; State v. Andrews*, 393 N.W.2d 76, 80 (S.D.1986).

Applying these standards to the facts of the instant case, we hold that Gallipo's motions for a judgment of acquittal were appropriately denied.

Gallipo acknowledged having sexual intercourse with victim. His sole defense was that victim consented to the act. Thus, the only element of rape at issue was whether Gallipo accomplished sexual penetration through the use of force, coercion or threats (SDCL 22–22–1(1)) or whether victim consented to sexual intercourse. As noted, the evidence in this regard must be reviewed in a light most favorable to the verdict. *Blalack, supra.*

Contrary to Gallipo's assertions, there is substantial evidence in victim's testimony to establish that she actively resisted Gallipo's advances and, thus, did not consent to sexual penetration. From the time victim discovered that Gallipo had removed his clothing, she repeatedly begged him to leave. All of her efforts in this regard were rejected by Gallipo. Victim only entered the bedroom with Gallipo after he forcefully grabbed her by the arm and pulled her in. Further use of force was exercised when Gallipo pushed victim down on the bed and attempted to kiss her. Victim physically attempted to resist Gallipo by repeatedly trying to shove and push him away. However, this only made him more angry and caused him to strike victim in the face. Gallipo himself acknowledged victim's struggles when he told her to quit "fighting" him. This statement reflects a physical resistance by victim.

Victim further resisted by planning a route of escape from the bathroom to the front door but this avenue was closed when Gallipo viciously drug her to the bathroom by her hair and then pulled her back into the bedroom. Once back in the bedroom, victim continued to resist but Gallipo restrained her by straddling her and ultimately forcing her into the acts of sexual intercourse. In reviewing this testimony, it is difficult to see how victim could have provided any greater resistance to Gallipo without suffering serious bodily harm at his hands.

against the victim or other persons within the victim's presence, accompanied by apparent power of execution[.]
We note that the above language was amended by the legislature during the 1990 legislative session in a manner totally ungermane to this opinion. *See,* 1990 S.D.Sess.L. ch. 161, § 2 and 1990 S.D.Sess.L. ch. 162, § 1.

Victim's resistance is corroborated by the testimony of the physician who treated her immediately after the rape. He testified that during treatment he detected bruising in victim's arm and her neck. He also noted an unusual trauma or abrasion near her vaginal opening, further supporting a finding of forced penetration.

■ Moreover, lack of consent by a victim in a rape case is not established solely by showing physical resistance by the victim. *Blalack, supra.* The element of compulsion can be satisfied by showing that the victim submitted out of fear of violence or injury. *Id.*

Victim's fear on the night of the incident was corroborated at trial by no less than five separate witnesses who had contact with her immediately after the rape. Victim's two friends from Gettysburg described victim's manner over the phone that morning using terms such as "hysterical," "frightened," and "scared for her life." One of her friends testified that he had to calm victim down to get her to call the police. When a police officer did arrive at victim's apartment she was so afraid that she would not even open the door to let him in. The officer testified that when victim did let him in she was "hysterical," "crying convulsively," and unable to answer questions until he calmed her down. Victim's friend Sharlene confirmed that when the officer picked her up on the way to the hospital victim was very shook up, scared and crying. Finally, even the physician who treated victim that morning testified that she was emotionally upset and crying.

■ Considering the foregoing testimony in connection with that of the victim, we find that there was clearly sufficient evidence from which the jury could reasonably conclude that victim actively resisted having sexual intercourse with Gallipo and only submitted out of fear of great bodily harm. Although Gallipo attempts to call victim's credibility into question by pointing to inconsistencies in her testimony and prior statements and particularly through her alleged intoxication on the night of the rape, in reviewing the sufficiency of the

evidence this court does not resolve conflicts of evidence or determine the credibility of witnesses. *State v. Wilcox,* 441 N.W.2d 209 (S.D.1989). These are matters for the jury to decide. *Id.* Here, the jury determined that victim's testimony was more credible than Gallipo's. In view of the extensive corroborative testimony provided by the balance of state's witnesses, it was clearly reasonable for them to do so. Accordingly, we find no error by the trial court in denying Gallipo's motions for a judgment of acquittal.

### ISSUE TWO

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN ALLOWING STATE TO ELICIT CERTAIN REBUTTAL TESTIMONY FROM GALLIPO'S WIFE? WE HOLD THAT IT DID NOT.

■ Prior to trial, Gallipo filed a pretrial motion under SDCL 19–13–13 (spousal privilege) to suppress certain statements made by his wife to an investigating detective. However, there is no written trial court order on the motion in the settled record. During trial, state was permitted to call Gallipo's wife as a rebuttal witness. State elicited testimony from her that she regularly used lotion on herself during sexual intercourse with her husband. Gallipo now contends that the trial court committed reversible error and violated the spousal privilege in admitting this testimony.

Initially, Gallipo has failed to preserve this issue for appeal. Although he filed a pretrial motion to suppress his wife's statements, he raised no objection whatsoever to her testimony during trial. This court has repeatedly held that reversible error cannot be predicated upon the denial of a motion in limine and that failure to specifically object to the evidence during trial forecloses complaint on the issue on appeal. *State v. Novaock,* 414 N.W.2d 299 (S.D.1987); *State v. Olson,* 408 N.W.2d 748 (S.D.1987). *See also State v. Jones,* 416 N.W.2d 875 (S.D. 1987) (pretrial motion in opposition to admission of videorecorded testimony insufficient to preserve issue for appeal).

Moreover, it is a long-standing rule in this state that a, "party desiring to compel the spouse to testify may at least call for the testimony, and is not to be deprived of it until the party-spouse formally objects and claims the privilege." *State v. Damm,* 62 S.D. 123, 130, 252 N.W. 7, 9 (1933) (quoting Wigmore on Evidence [2d Ed.] § 2243). Thus, this court has held that in a criminal case the state is entitled to call the wife of the defendant and proceed with her examination until objection or assertion of the spousal privilege. *Damm, supra. Accord, State v. Dikstaal,* 320 N.W.2d 164 (S.D.1982). In this instance, state called Gallipo's wife to testify and proceeded with her examination without any objection or assertion of the spousal privilege whatsoever. In doing so, state merely followed the precedent established by this court. We find no prejudicial error in its actions. *See, Dikstaal, supra.*

Under the state of this record we cannot reach the merits.

Affirmed.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., dissents.

SABERS, Justice (dissenting).

I believe it is wholly improper to base a conviction upon the privileged communications between a defendant and his wife, and I would reverse.

The majority contends that this Court cannot even address the merits of the trial court's effective denial of the defendant's pretrial motion to suppress his wife's testimony because no written order on the motion appears in the settled record and the defendant failed to object further at trial. As the majority knows, however, SDCL 19-9-6 and 23A-44-13 [1] permit this Court to consider on appeal errors which are so substantial and obvious that they rise to the level of "plain error," even though technically they have not been preserved for appeal.

The breach of the spousal privilege at trial is such a substantial and obvious error. The privilege is secured under South Dakota law by the clear language of SDCL 19-13-13: "An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication [2] between the accused and the spouse."

In this case, it is undisputed that the challenged testimony falls outside the handful of limited exceptions to the privilege at SDCL 19-13-15 and the "joint participation" exception created in *State v. Witchey,* 388 N.W.2d 893 (S.D.1986). Here the defendant, in his motion to suppress, formally asserted the privilege, as permitted by SDCL 19-13-13 and as required by *State v. Damm,* 62 S.D. 123, 252 N.W. 7 (1933). Under these circumstances, the error of the trial court in admitting the testimony was obvious.

It was also substantial. The pedigree of the spousal privilege asserted by the defendant is ancient and its public policy justification is urgent and preemptive.

The purpose of the marital communication privilege is many: the protection of the marital relationship; to protect marital privacy; and to insure the ability of one spouse to communicate privately with the other.... It can even be argued that the rule is a logical extension to the constitutional prohibition against self-incrimination.

*State v. Witchey,* 388 N.W.2d at 897 (Sabers, J., dissenting).

Any weakening of the spousal privilege has implications which are broader and

---

1. SDCL 23A-44-13 provides in part: "(Rule 51) Exceptions not required to preserve objection ... it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor...."

2. SDCL 19-13-12 provides: "A communication is confidential if it is made privately by any person to his or her spouse during their marriage and is not intended for disclosure to any other person."

These communications, though nonverbal, were "made privately," "during their marriage," and were "not intended for disclosure to any other person."

deeper than its effect on particular marriages and particular cases. As the Federal District Court for Colorado stated in *United States v. Neal,* 532 F.Supp. 942 (D.Colo.1982),

> Over at least the last decade, the circle of privacy surrounding each of us has drawn smaller with each new governmental incursion and each new technological advance. Courts have sought to preserve inviolable some small island of privacy as a refuge for the human spirit where government may not intrude. Here the question is whether one such sanctuary, protected by the common law for centuries, shall be breached, rendering the secrets told to wives by husbands fair game for government investigators.

> The issue is whether in our free society the government may, by making a deal with one's spouse, invade the confidences of marriage to turn those nearest and dearest into informers ... [T]he police could obtain much information of great value in combatting crime. The only question is whether the price would be too high.

*Id.,* at 946.

Not only may this Court reach the merits under the plain error rule, its decision on the merits ought to be equally plain. The use by the State of a wife's testimony against her husband concerning the intimate details of their sexual relationship is so self-evidently prejudicial to the husband in his capacity as a defendant in a rape trial that we should not hesitate to reverse a conviction resting on such testimony. Certainly the State has not shown beyond a reasonable doubt that such error was harmless, which makes it reversible error. *State v. Michaelek,* 407 N.W.2d 815, 819 (S.D.1987).

I respectfully dissent.