STATE of South Dakota, Plaintiff
and Appellee,

v.

Randy SVIHL, Defendant and Appellant.

No. 17499.

Supreme Court of South Dakota.

Considered on Briefs Jan. 14, 1992.

Decided Aug. 19, 1992.

Mark Barnett, Atty. Gen., Craig M. Eichstadt, Deputy Atty. Gen., Pierre, for plaintiff and appellee.

Catherine E. Mattson, Rapid City, for defendant and appellant.

AMUNDSON, Justice.

Randy Svihl (Svihl) appeals from his jury conviction and trial court's judgment and sentence on nine counts of rape. We affirm.

## FACTS

The victim in this case, E.U., was born January 4, 1977. Her biological parents were married at the time of her birth, but divorced when she was four years old. The victim's mother moved in with Svihl in the fall of 1981. The two were married in 1983 shortly after the divorce of E.U.'s parents.

E.U. lived in North Dakota with her mother, her brother, and Svihl and attended school there through the end of the third grade. In 1986, E.U. moved back to Lead, South Dakota, with her new family. The record reflects E.U. was raised in a dysfunctional home where her mother was alcoholic and abused drugs, her mother was physically abusive to her, and E.U.

observed frequent violence and assaultive behavior exhibited by her mother and Svihl in the home.

The record also reflects E.U. was an "A" and "B" student in grades one through five, but in the sixth grade, her grades dropped sharply. It further reflects she had numerous sexual partners between the fifth and seventh grade and began using alcohol at the same time. E.U. spent several months in 1990 at the Human Services Center (HSC) in Yankton, South Dakota, for court-ordered drug and alcohol treatment.

E.U. first reported an incident of sexual abuse to her mother in August, 1988. She told her mother that she had been lying on the living room floor half asleep when Svihl laid down next to her, rubbed her back, put his tongue in her ear and asked her to go upstairs to the bedroom. Although E.U. was upset and crying when she told her mother about the incident, her mother did not act until September, 1988, when she placed E.U. with friends outside the home.

From September 1988 until mid–1989, E.U. remained with friends or in foster care. E.U.'s mother underwent drug and alcohol treatment followed by a jail term during this time period. E.U. returned to her mother in mid–1989 until January, 1990, when State filed simple assault charges against mother for physically abusing E.U. E.U. was the complaining witness and the judge found mother not guilty.

Over a period of time after moving to Lead, E.U. spoke with several different persons regarding sexual abuse by Svihl. She spoke to her school counselor in Lead, who contacted the Department of Social Services (DSS). When DSS spoke to E.U., she denied the allegations. She spoke to Mark Ventrella, a counseling associate with West River Mental Health in Spearfish, South Dakota, on March 6, 1990. When she was at HSC, she confided in Kevin Haley, Kay Cox and James Charles, who all counseled her regarding sexual abuse. E.U. also consulted with Cindy Cihak at HSC in a sexual abuse "survivor's group."

During her counseling, E.U. recounted numerous instances of sexual contact with Svihl dating from the time she was approximately seven years old. These instances included vaginal intercourse, anal intercourse, and oral contact. With each individual she confided in, E.U. often denied any abuse occurred before opening up and discussing it, and details of the incidents as related by E.U. were often inconsistent.

These incidents of sexual contact and rape were referred to the Lawrence County State's Attorney's Office. In September of 1990, Svihl was indicted by a grand jury on nine counts of rape and he pleaded not guilty. Trial was held March 6, 7, and 8, 1991, and the jury returned a verdict of guilty to all nine counts. The judge sentenced Svihl to fifteen years on Count 1 and five years each on Counts 2, 3, 4, and 5, all to run consecutively. On Counts 6, 7, 8, and 9, Svihl received five years for each, to run concurrent with the other sentences. Thus, the total sentence was for thirty-five years. All of the sentences from this conviction were made to run concurrent with another penitentiary sentence presently being served by Svihl for sexual contact with another child. This appeal followed. Further facts will be discussed below as necessary.

### ISSUES

1. Whether trial court erred in admitting into evidence expert testimony concerning the characteristics of sexually abused children and the credibility of the complaining witness?

2. Whether the evidence is sufficient to sustain a verdict of guilty beyond a reasonable doubt on all nine counts of rape?

### ANALYSIS

*1. Expert Testimony*

Prior to trial, State requested that it be allowed to offer the testimony of Kathy Peil (Peil), who is an expert with regard to the behavioral manifestations of sexually abused children (rape trauma syndrome). Svihl made a motion to exclude Peil's testi-

mony on the grounds that State could not lay the foundation to Peil's expertise in the field, the testimony was not accepted within the scientific community, and the testimony had no relevance.

The trial court held a pretrial motion hearing at which it took testimony from the expert and heard arguments from both parties. Svihl expressed concern at the hearing that Peil's testimony would be offered to enhance E.U.'s credibility. State told the court it would only be relying generally on Peil's expertise and would ask hypothetical questions relative to the evidence regarding behavior and statements being retracted by E.U. Trial court asked Svihl's counsel if she would object to the use of Peil's testimony to support State's theory of the case if State adequately established its theory, to which she replied *she would have no objection.*[1]

The trial court concluded Peil's testimony was being offered as a possible explanation for E.U.'s initial denials of abuse, and later retractions of her testimony and was therefore relevant and admissible to establish general characteristics of child sexual abuse syndrome.[2]

1. Specifically, Svihl's counsel stated as follows:

MS. MATTSON: Your Honor, specifically to the State's request to get into the theory concerning behavior of sexually abused children, I would ask that you would wait on your ruling on this particular issue until we have the hearing concerning Kathy Peil, because I think the real reason the State wants this in is to somewhat bone up their theory on this case. And I'm not certain that their intent really is to go to plan or preparation—or common plan and scheme but more to go to their theory that they're trying to espouse through Kathy Peil.

THE COURT: Assuming that's correct and assuming they can establish that theory, then do you have any objection to the use of this evidence?

MS. MATTSON: No.

THE COURT: You would agree then that it would be both factually and legally relevant?

MS. MATTSON: Yes. And we would also be using this evidence in our case as part of the defense as to have ever-changing stories by the victim in this case.

THE COURT: So, as it stands now, the use of that evidence by the State would also fit into your theory of the case?

MS. MATTSON: Absolutely.

2. Peil first explained the characteristics of the syndrome as follows:

A. ... In the area of sexuality, there are three areas of behavior which directly relate to having been sexually abused, and this means, in most cases, where you find one or more of the three behaviors, I can be pretty certain the child or adolescent has been sexually abused and, in fact, if you find any of these with a child or adolescent, it would be the exception to the rule if they had one of these three things and weren't sexually abused. The three areas are as follows, the three behaviors: one is excessive masturbation, the second is sexual acting out or hypersexuality or what most of us know as promiscuity, and the third area is sexually abusing another child. ...

State then propounded the following denominated hypothetical questions to Peil:

Q. Okay. Now if there was evidence in this case that the young girl that was involved was sexually active in terms of intercourse, with, literally, 17, maybe some 30 different individuals and her age during this time frame would have been anywhere from 9 to 13, would that type of activity fall into what you're describing as sexually acting out or promiscuity?

A. Absolutely. ...

Q. Now if there was evidence in this case that some of that sexual acting out took place when she was, in fact, not with the alleged perpetrator or, in other words, out of his grasp, in another setting outside of the home, but yet this activity would continue on, would you find that unusual or inconsistent?

A. No. In my experience with victims, the sexual acting out does not occur necessarily simultaneously with the sexual offense, especially if the child is pre-adolescent when the sexual abuse starts.

   .    .    .    .    .

Q. ... Now the second area that you talked about was in the area of self esteem. ...

Q. If there was evidence in this case that the child involved went from being a A's and B's student to a D student within a period of really only a year, would that fit, possible, into that category of lack of self-esteem, particularly if there was evidence that this young lady testified the reason why she was doing poorly was because she didn't care anymore?

A. Yes. Just because a child's grades go down doesn't mean they have been sexually abused, but that coupled with some other things could certainly be a signal to be looking at in the area of self-esteem.

Q. Okay. Now let me continue along with this. Would you find it unusual that this girl's grades, E.U.'s grades, continued to be rather good, B's and A's, for almost two years after the point at which she indicated the sexual intercourse began? In other words, she continued to be a good student for a period of two years?

State informed trial court at a pretrial motion hearing that it would be using hypothetical questions to elicit Peil's opinion as to general characteristics of sexually abused children, but would not ask Peil her opinion as to whether or not E.U. was sexually abused or for an opinion on the victim's credibility. Expert testimony is admissible without the use of hypothetical questions, as long as the expert is able, if asked, to specify the data upon which his/her opinions are based. SDCL 19–15–4. Generally, a hypothetical question asks an expert to assume the truth of selected facts and then state an opinion based upon those facts. McCormick on Evidence, 3rd Ed., 1984. The questions, as State propounded to Peil at trial, were not in the form of a hypothetical but went beyond an assumption of facts and referred specifically to E.U. Peil's solicited opinion based on those facts, and whether or not E.U. had been sexually abused, clearly exceeded State's legal position in support of Peil's testimony, as stated at the pretrial motion hearing. The questions actually asked of this witness came perilously close to an attempt on the part of State to bolster the credibility of the complaining witness.

Svihl moved to exclude Peil's testimony prior to trial but, in fact, never renewed the objection to any of the so-called hypothetical questions asked of Peil during her direct examination. Our review of the record reveals Svihl only requested a standing objection to Peil's testimony after having moved for acquittal at the close of State's case-in-chief and having such motion denied.

In *State v. Gallipo*, 460 N.W.2d 739 (S.D. 1990), we stated:

This court has repeatedly held that reversible error cannot be predicated upon the denial of a motion in limine and that failure to specifically object to the evidence during trial forecloses complaint on the issue on appeal.

*Id.* at 743 (citing *State v. Novaock*, 414 N.W.2d 299 (S.D.1987); *State v. Olson*, 408 N.W.2d 748 (S.D.1987)). Svihl's objection to Peil's testimony at the pretrial hearing went to Peil's qualifications and the relevance of her testimony. Svihl never specifically objected to the hypotheticals at trial, and thus is precluded from presenting this issue on appeal. *Gallipo, supra.*

We further hold Svihl failed to preserve the issue because the trial court never ruled on Svihl's request for a standing objection. Svihl's attorney requested a standing objection after her motion for acquittal was denied, and the court's only response was: "We'll take a recess." We have previously held:

A. No, I do not find that—as I said before, these symptoms, these behavioral things don't come up right away. They may be delayed all the way from a little while, where it's happening a little while afterwards, or a year afterwards, so I don't find that very surprising that it comes up at different times, at least from my experience with talking with victims and also talking about adults who have been victims.

Q. ... The third area that you talked about was trust. ...
Q. I guess, in that area, if there was evidence in this case that E.U. has at times exhibited talking about hating the Defendant and at other times, in fact in front of this courtroom, talked about loving him, do you find that to be inconsistent with this discussion about trust.
A. Oh, no.

Q. ... Let's talk then about power and powerlessness. ...

Q. If there was evidence in this case that E.U., the victim in this case, was again in the same time frame 9, 10 years old, started to use and abuse very seriously, it would appear, alcohol and drugs, would you find that to be inconsistent with a child who has been sexually abused?
A. It's not inconsistent at all.

Q. Now would it be a fair statement that any one of the things that we have talked about here would have different causation other than sexual abuse; isn't that fair?
A. Most of the things we've talked about, I think, that the problems in the sexual areas that I have outlined, which are excessive behavior, sexual promiscuity and sexual abuse of other children, I think those are directly related to being sexually abused. ...
Q. If I understand your testimony, when you start to see a pattern in these areas, that's when you start to draw conclusions; is that right?
A. It certainly is.

[I]f the trial court fails to decide or rule on a motion, nothing is presented for review in the appellate court.... The burden of demanding a ruling rests upon the party desiring it. If a party permits the court to proceed to judgment without action upon his motion or objection, he will be held to have waived the right to have the motion or objection acted upon.

*State v. Sickler,* 334 N.W.2d 677, 679 (S.D. 1983) (citing *American Fed. Sav. & Loan Ass'n v. Kass,* 320 N.W.2d 800, 803 (S.D. 1982)). Thus, since the court was never asked to rule on the request for a standing objection, under our previous holdings we cannot review the issue.

As is stated in Justice Henderson's special concurrence in *State v. Floody,* 481 N.W.2d 242, 258 (S.D.1991), "[m]embers of our Court have been troubled by [the use of expert testimony to enhance credibility] on several occasions." Again, this case raises a concern for the potential for trial by experts.

Much has been written on this subject in appellate decisions and treatises by professionals involved in the specialty of treating and counseling sexually abused children and the abuser. In the case of *United States v. St. Pierre,* 812 F.2d 417 (8th Cir.1987), the court of appeals affirmed convictions on charges alleging carnal abuse of a minor. The defendant claimed that the trial court erred in permitting a clinical psychologist's testimony as to traits and characteristics of sexually abused children as compared with the traits and characteristics of the victim. The court held as follows:

A fundamental test for the admission of expert testimony is whether it will assist the jury in resolving the factual issues before it. These cases present difficult problems for the jury. The testimony of the accused and the victim is generally in direct conflict. The crime is secretive with extreme pressures against revelation, especially when committed in a family setting.

The Supreme Court of Minnesota addressed this precise evidentiary problem in *State v. Myers,* 359 N.W.2d 604 (Minn. 1984). That court recognized that the type of testimony presented by Dr. Curran could be very helpful because jurors are at a disadvantage when dealing with sexual abuse of children. 'Incest is prohibited in all or almost all cultures, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse.' *Id.* at 610.

812 F.2d at 419–20. The expert in this case did not testify as to whether or not in her opinion E.U. was testifying truthfully. The problem in this specific case is that the State did not limit its questions to characteristics, but solicited responses to the supposed hypothetical questions which invited an opinion on whether or not E.U. exhibited traits and behaviorism of a sexually abused child. There is no question that counsel for Svihl intended to question E.U. in regards to her changing stories, her drug and alcohol problems, her moral problems, her sexual activity, her untruthful characteristic, and her treatment programs, in order to attack her version of the incidents. This defense tactic, therefore, made it advisable to apprise the jury of the traits and characteristics that can be evidenced by a minor who has been sexually abused. The better practice would be to limit the expert testimony to such traits and characteristics.

Since a trial is a truth-searching mechanism, the expert's testimony relating to characteristics and traits would assist the disadvantaged jury in undertaking its duty to determine where the truth lies in this case. Had the State elected to stop its inquiry after obtaining the expert's opinion on the traits and characteristics of sexually abused children, this case would have been less difficult for this court to decide and simultaneously offered fewer issues for Svihl to present for appellate review. These are difficult cases in a society that is ever changing, but the judiciary, the prosecutors, and the public must never lose sight of a defendant's right to a fair trial under our system of justice. Lest it go unheeded, the prior decisions by this court should not be translated as a granting of a vested right to try cases of this nature by experts

in order to shore up weaknesses in the case, or to feed a "win-at-all-costs" mentality. The admission or rejection of expert testimony has to be resolved by the trial court on a case-by-case basis, as was done here.

■ Notwithstanding such concerns and the failure to properly preserve the issue, we find from our review of all the evidence presented to the trial court that there is abundant evidence to support Svihl's conviction and record reflecting a, maybe not perfect, but a fair trial. Therefore, if failure to exclude Peil's testimony was error, we find it is not of such a substantial nature to constitute grounds for reversal. *State v. Michalek*, 407 N.W.2d 815, 818–19 (S.D.1987); *State v. Dokken*, 385 N.W.2d 493, 498 (S.D.1986).

## 2. *Sufficiency of Evidence*

■ Svihl argues there was insufficient evidence to sustain his conviction on all nine counts of rape. Our scope of review for this type of challenge is well settled. We must determine whether there is evidence in the record which is sufficient to sustain a finding of guilt beyond a reasonable doubt and, to make this determination, we accept the evidence and the most favorable inferences fairly drawn therefrom which will support the verdict. *State v. Olson,* 449 N.W.2d 251, 256 (S.D.1989); *State v. Miller,* 429 N.W.2d 26, 38 (S.D. 1988); *State v. Banks,* 387 N.W.2d 19, 27 (S.D.1986).

■ Svihl does not argue that there was insufficient testimony by E.U. to support his conviction on the nine counts. Rather, he argues that E.U. as the complaining witness was not credible and therefore there was insufficient evidence to convict him. We have previously held that it is the function of the jury to resolve evidentiary conflicts, determine the credibility of the witnesses, and weigh the evidence. *State v. Battest,* 295 N.W.2d 739, 742 (S.D.1980). As such, we afford the strongest presumption in favor of the jury's determination of credibility.

Although E.U. did offer some inconsistencies in her statements, the jury heard all the testimony offered by State and resolved any conflicts in the evidence in State's favor. Our review of the record reveals abundant evidence which is sufficient to sustain the jury's finding of Svihl's guilt beyond a reasonable doubt.

Accordingly, the conviction is affirmed.

MILLER, C.J., and SABERS, J., concur.

WUEST, J., concurs in result.

HENDERSON, J., dissents.

WUEST, Justice (concurring in result).

I agree with the majority opinion there is sufficient evidence to sustain all nine counts of rape. I further agree the defendant failed to preserve his record by failing to request a ruling from the court on his standing objection to the testimony of witness Peil. Therefore, we do not review the testimony. I vote to affirm.

HENDERSON, Justice (dissenting).

Peil's testimony was direct commentary on the girl's credibility, which is within the exclusive province of the jury. *State v. Huber,* 356 N.W.2d 468, 476 (S.D.1984); *State v. Myers,* 88 S.D. 378, 381, 220 N.W.2d 535, 537 (1974).

In allowing into evidence expert testimony on the credibility of the complaining witness and the rape trauma syndrome, trial court erred. Peil's answers to hypothetical questions embraced ultimate issues of fact. Peil became the jury. It is contrary to SDCL 19–15–2 regarding the propriety of an opinion of an expert witness. Also, under SDCL 19–12–3, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Accord: *State v. Logue,* 372 N.W.2d 151, 157 (S.D.1985). Here, the prejudicial effect far outweighed the probative value. In *Logue,* which I joined, Justice Wuest, writing for this Court expressed, at page 158, "Not every accused is guilty, but every accused, innocent or guilty, is entitled to a fair trial." In my opinion, Svihl did not get a fair trial. In *Logue,* at 158, we held that a social worker's opinion invaded the province of

the jury. We held that it was not harmless error. Here, we say it is harmless error. I respectfully disagree.

We have, before us, the underlying message that E.U. was abused. Peil did not confine her opinion to a rape trauma syndrome. She specifically mentioned E.U. Moreover, the prosecutor in his questions specifically zeroed in on E.U. As an example, the prosecutor (jury trial transcript, at 260, 262), couched his questions in this phraseology and vernacular: "If there were evidence in this case...." "this young lady...." "this girl's grades...." "she indicated the sexual intercourse began." This is contrary to all of the settled law on this general subject. A prosecutor is not to go into the specifics of the facts and relate the rape trauma syndrome to the set of facts before the court. General characteristics testimony, yes. Details related to the scenario at hand, with conclusions, no.

In my dissent in *State v. Bachman*, 446 N.W.2d 271 (S.D.1989), joined by Justice Sabers, I developed the point that the nature of the rape trauma syndrome, developed as of that date absolutely did not permit its proof that a rape occurred. At 279 thereof, I quoted from *People v. Bledsoe*, 681 P.2d 291, at 300, 36 Cal.3d 236, at 249–50, 203 Cal.Rptr. 450, at 459 (1984), as follows:

> There is, however, a fundamental difference between rape trauma syndrome and both the battered child syndrome and the other scientific methods of proof that have in the past been evaluated against the *Frye* [293 F. 1013 (D.C.Cir.1923)] standards of reliability. Unlike fingerprints, blood tests, lie detector tests, voice-prints or the battered child syndrome, (footnote omitted) rape trauma syndrome was not devised to determine the "truth" or "accuracy" of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors clients and patients.

At the Motions Hearing, transcript III, at 41, the trial judge questioned the state as to the parameters of the rape trauma syndrome. Thereat, state reflected that it would not ask Peil to give an opinion that E.U. was sexually abused. But it did. It fudged. Before it was all over, the state, under its questioning, and Peil, by her answers, established by testimony, before the jury:

E.U. was sexually abused;

E.U. exhibited behavioral signs, from this specific sexual abuse that she lost self-esteem, trust, and became powerless.

The predicate was this: Svihl was guilty. Instead, you see, of testifying in generalities, Peil connected Svihl to the sexual abuse. And over and over and over. This is an evidentiary defilement. And I cannot join the majority opinion.

In my dissent in *State v. Spaans*, 455 N.W.2d 596, 599 (S.D.1990). At 599, I wrote:

> Without, again, regaling the reader with my extensive writings on this subject, I call the reader's attention to my special concurrence in *State v. Hallman*, 391 N.W.2d 191, 196–7 (S.D.1986) for my concern that incest or rape trauma victims cannot be singled out, specifically, in a given factual scenario, by professional experts as having had a crime perpetrated upon them; and, also, my dissent in *State v. Bachman*, 446 N.W.2d 271 (S.D.1989), for my general academic viewpoint, spiced with numerous authorities on rape trauma syndrome, that it is improper to permit an expert to suggest that a complainant exhibits rape trauma syndrome, (or having been sexually contacted) because there is a certain aura of special reliability and trustworthiness implicit in the experts' testimony (hearsay evidence vaulted over solid evidence); and, lastly, my dissent in *McCafferty v. Solem*, 449 N.W.2d 590 (S.D.1989), wherein I attempted to pinpoint the difference in behavioral science expert testimony, bearing on the credibility of sexually abused children. One concept pertains to approval or disapproval of expert testimony on credibility of a victim.

Eleven authorities did I root out which decries a stamp of approval of expert testimony on credibility. *McCafferty.* In *McCafferty,* at 596, I pointed out that some courts refuse to permit behavioral science experts to offer opinions on credibility of sexually abused children as a class.

Hearsay is a very low quantum of proof. Here, Peil's statements invaded the province of the jury because her purpose of testifying was to enhance the credibility of the alleged victim. Again, it appears to me that social experts are preempting the constitutional right of a trial by jury. It poses a great danger to the Bill of Rights. *United States v. Azure,* 801 F.2d 336 (8th Cir. 1986); *State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73 (1986).

There are many undisputed facts in the record which have not been related for the reader. E.U., a disturbed child, expanded and retracted stories of sexual abuse on a monthly basis. While at the Human Services Center, she wrote a 12 page statement describing some 14 incidents of sexual and physical abuse with 30 different men, all incidents alleged to have been committed when she was between the ages of 11 and 13. Two of these alleged 30 men testified at trial that they had never abused her. Her allegations against these two men included that three boys had to hold her down when she was raped. There was no corroboration of this horrible revelation. A counseling expert, one Mark Ventralla, testified that based upon a psychological examination and his interviewing with her that she gave frequent contradictory answers to questions. He testified, at this trial, that she gave no thought to the consequences of what she, from time to time says.

Faced with the credibility factor of E.U.'s testimony, State shifted its position to establish the alleged crimes with "expert testimony." State sought to bolster her stories. After all, it faced alleged victim's retractions, lack of details, and inconsistencies.

In the context of the preceding paragraphs, the reader's attention is directed to SDCL 19–16–38 and *State v. Thompson,* 379 N.W.2d 295, 298 (S.D.1985) relating to the *reliability* of statements. I respectfully suggest that these out of court statements are not admissible thereunder. E.U. was not a reliable witness. *See, State v. McCafferty,* 356 N.W.2d 159 (S.D.1984) and the three factors therein listed as requirements for admission of evidence in this factual scenario. Here, the first factor was missing, i.e., sufficient "indicia of reliability."

State did not meet its burden of proof as to the necessary factors under the settled law of this state. Rife with inconsistencies, recantations and conflicting assertions of E.U., hearsay testimony was admitted; under SDCL 19–16–38, an inadequate showing was established of "sufficient indicia of reliability." Testimony revealed that she stole money and a car from her mother, shoplifted prior to being 9 years old, and had a history of telling falsehoods. She formally accused her mother of a crime; the mother was tried and found not guilty by a jury.

When will this Court draw a line on offered testimony to enhance the credibility of a witness?